PENFIELD v. DAVIS, Collector of
Internal Revenue et al.
Civ. No. 6708.

United States District Court
N. D. Alabama, S. D.

May 7, 1952.

Roberts & McInnis, Washington, D. C., and Cabaniss & Johnston, Birmingham, Ala., for plaintiff.

Ellis N. Slack, Acting Asst. Atty. Gen., Andrew D. Sharpe and Harvey M. Spear, Special Assts. to the Atty. Gen., and John D. Hill, U. S. Atty., and W. R. Bradford, Asst. U. S. Atty., Birmingham, Ala., for defendant, Collector.

LYNNE, District Judge.

### Statement

This proceeding was set for hearing, following due notice, on plaintiff's motion for summary judgment under Rule 56, 28 U.S.C. Defendant's objection to the submission for summary judgment having been overruled, affidavit on behalf of defendant was received and at defendant's request the hearing was continued to enable defendant to interview and take the testimony of the surviving members of the Board of Directors of Gulf States Paper Corporation which had authorized the exchange of debentures for the preferred stock of that corporation in May, 1942.

The Court announced that if such testimony were taken, the submission would be regarded as a general submission rather than limited to the basis of a motion for summary judgment.

Prior to submission defendant also filed motion for summary judgment and at the

hearing pursuant to the continuance, it was announced that the surviving directors above mentioned, namely, Herbert D. Warner, Mildred W. Warner and Wagner P. Thielens, had been produced at the instance and pursuant to the request of counsel for defendant and the testimony of the two Warners had been taken under oath before A. B. Hale as commissioner on direct examination by and at the instance of counsel for defendant and on cross-examination by counsel for plaintiff, and that counsel for defendant had waived examination of Mr. Thielens.

The testimony so taken was presented and lodged with the Court whereupon counsel for defendant announced that defendant did not desire to offer in evidence the testimony so taken. Counsel for plaintiff stated that the testimony thus taken by and at the instance of defendant was deemed material and pertinent and counsel for plaintiff thereupon indicated their desire that such testimony be offered on the submission in accordance with the previous understanding. Counsel for defendant announced that if the testimony were received he would like the opportunity to examine the deponents at greater length before the Court on additional matters that appeared in the depositions, that while he had taken the depositions he did not care to offer them and was not willing that they be received on the offer of the plaintiff. The Court declined to postpone the submission for further examination of witnesses and announced, in accordance with the announcement at the previous hearing, that submission would be taken as a general submission on the pleadings and proof, for final judgment on the pleadings and affidavits offered in support of the motions for summary judgment together with any additional evidence offered.

There was no objection to that announcement. The Court reserved decision whether, under the circumstances, the depositions, which were given under oath before the Commissioner and returned by him, were admissible under the applicable Rules or as being within the scope of the understanding announced at the previous setting.

No further testimony was tendered by either party and the cause was submitted, without objection, in accordance with the Court's announcement.

It does not appear that formal ruling on the admissibility of the depositions or that consideration of that testimony is necessary, in view of the findings and conclusions here announced, which are based upon the record exclusive of the depositions. However, the Court is of opinion that the objection in behalf of the defendant Davis to plaintiff's offer of such depositions is due to be sustained. Rule 26 (d) (3), Federal Rules of Civil Procedure.

### Findings of Fact

1. The Gulf States Paper Corporation (Gulf States) was incorporated under the Laws of Delaware in 1928 with an authorized capital of 25,000 shares of 7% cumulative preferred stock (par value of $100 per share) and of 250,000 shares of common stock without par value (stated value of $1 per share), to take over the business and properties of the E-Z Opener Bag Company (the predecessor company); only 200,000 shares of common stock were ever issued. The entire preferred stock and 200,000 shares of common stock of Gulf States were issued in a statutory reorganization to the stockholders of the predecessor company.

2. Plaintiff was an employee or executive officer of the predecessor company since prior to 1920 and continued to be an employee or officer of Gulf States. In 1942 he was the vice president in charge of operations of Gulf States but was not a director nor concerned with financial or tax policies of Gulf States during 1942. In 1942 and for many years prior thereto he was the owner of common and preferred stock in Gulf States.

3. The defendant is now and was on September 15, 1950, Collector of Internal Revenue for the District of Alabama. On that day plaintiff paid to him both a deficiency in income tax for 1943 which the Commissioner of Internal Revenue (Commissioner) had determined and assessed against plaintiff in the amount of $12,391.09 and interest in the amount of $4,832.53,

which had accrued on such deficiency to September 15, 1950, or a total of $17,223.62.

4. On October 2, 1950, plaintiff filed with the defendant a claim for refund of $17,223.62—that is, for the full amount of the deficiency and interest paid. The Commissioner did not act upon the claim within six months and plaintiff brought this suit for refund of the said amounts as illegally assessed and collected, pursuant to Section 3772 of the Internal Revenue Code, 26 U.S.C. § 3772.

5. Gulf States, when acquiring the assets and assuming the liabilities of the predecessor company, offered to the public $2,500,000 first mortgage 6½% sinking fund gold bonds, the proceeds of which were used for the construction and equipment of a paper mill being erected at Tuscaloosa. The Canal Bank and Trust Company of New Orleans, which acted as underwriter and financial advisor to the management of the predecessor company recommended that Gulf States, at its organization, issue 7% preferred stock in the amount of $2,500,000, because such preferred stock would facilitate the sale of the bonds; the underwriters, including the Canal Bank, assumed their underwriting obligations with regard to the bond issue on condition that the preferred stock be issued and that the bonds bear common stock purchase warrants exercisable to June 1, 1935, at $12 per share. The capitalization resulting from the issue of $2,500,000 of preferred stock on the reorganization had the effect of placing that additional amount of assets back of the bonds, as capital, and thus strengthening the marketability of the bonds.

50,000 shares of common stock were reserved for issuance under those warrants but were never issued because the warrants were not exercised.

6. The bonds were sold at a discount, which the balance sheet as at May 31, 1929, reflected in the amount of $193,903.20, were paid off from time to time, and the balance called for retirement on December 1, 1935. While the bonds were outstanding, the common stockholders did not receive any dividends. By virtue of an agreement between all of the preferred stockholders and Gulf States, dividends on the preferred stock were not declared or paid and accumulated during the period 1928–1934, but payments were begun on the accumulation during the fiscal year ended May 31, 1935. At that time the arrearages on the preferred stock for the six-year period during which dividends had not been paid amounted to $1,050,000. By the end of the fiscal year 1941, this accumulation had been fully paid up and the dividends on the preferred became current, for the first time, in 1942, in which year a dividend of $400,000 was also paid on the common stock ($2 a share). Thereafter, Gulf States continued to pay dividends on the common stock. The divided payments during the fiscal years ended May 31, 1935, to 1947, inclusive, were as follows:

| | Dividend Payment On | | |
|---|---|---|---|
| Year | Common Stock | Preferred Stock | Total |
| 1935 | $ | $ 175,000 | $ 175,000 |
| 1936 | | | — |
| 1937 | | 525,000 | 525,000 |
| 1938 | | 350,000 | 350,000 |
| 1939 | | 350,000 | 350,000 |
| 1940 | | 350,000 | 350,000 |
| 1941 | | 525,000 | 525,000 |
| 1942 | 400,000 | 175,000 | 575,000 |
| 1943 | 200,000 | | 200,000 |
| 1944 | 300,000 | | 300,000 |
| 1945 | 295,500 | | 295,500 |
| 1946 | 295,500 | | 295,500 |
| 1947 | 295,500 | | 295,500 |
| | $1,786,500 | $2,450,000 | $4,236,500 |

There is no suggestion in the affidavits tendered on behalf of defendant or otherwise inferable that the cash dividend policy of the corporation following retirement of the bonds in 1935 was not a fair and substantial distribution of earnings in view of corporate requirements; and this applies to the year 1942 and following years.

7. The holders of the preferred stock were entitled under the provisions of the corporate charter to a cumulative dividend which was payable before any dividend on the common stock could be paid. In the event of any liquidation or dissolution of Gulf States, the holders of the preferred stock were to receive $100 per share and accrued and unpaid dividends. At the option of the Board of Directors, the preferred stock was subject to redemption in its entirety on any dividend paying date at a price of $105 per share plus accumulated and unpaid dividends. The holders of the preferred stock had no voting power under the charter provisions except (a) upon the question of selling, conveying, or transferring the property and assets of Gulf States as an entirety and (b) in the event that Gulf States should fail to pay any dividends upon the preferred stock and such dividend should remain in arrears for six months, the holders of preferred stock had the right to vote on all matters during the continuance of such default until Gulf States had paid up all accrued dividends upon the preferred stock.

In adddition to the specific provisions of the charter of Gulf States, the holders of the preferred stock had the right under Section 26 of the general corporation law of Delaware, Rev.Code 1935, § 2058, to vote as a class on proposals for any amendment of the charter which would alter or change the preferences, special rights or powers given to the preferred stock so as to affect it adversely or would increase or decrease the par value thereof, the affirmative vote of a majority in interest of the preferred being in that event necessary to the adoption of the amendment.

And under Section 59 of the Delaware Corporation Law, Rev.Code 1935, § 2091, the preferred stockholders had the right to vote upon any proposal for the merger or consolidation of the corporation.

8. The preferred stock carried no participating equity ownership or right in the earnings or assets of Gulf States beyond (a) the right to receive dividends cumulative at the rate of 7% annually before any dividends could be paid on the common, (b) the right to receive payment of the par value of the preferred shares on liquidation, in preference over the common, and (c) the right to receive par and a premium of $5 per share in the event of redemption of the preferred prior to liquidation.

At the time of the issue of debentures in exchange for the preferred stock in 1942, the established earning power of Gulf States gave practical assurance of current and prospective earnings sufficient to pay preferred dividends currently as they accrued. The preferred stock had become the senior security and was readily marketable at par or better.

Because of the restriction of the preferred equity to the right to receive annual dividends at the rate of 7%, the reasonably prospective assurance of the earning and payment of such fixed dividend and the equity, ultimately, to receive the par value of the shares on liquidation (or par value plus a 5% premium in the event of redemption prior to liquidation), ownership of the readily marketable preferred stock of Gulf States was not in 1942, from the practical and economic standpoint of the holders, to be regarded as substantially different from the holding of a debenture security of the corporation, likewise to be its senior security, bearing the same rate, payable in the same principal amount and, like the preferred, subject to prepayment or redemption on call at $105. Reference is made to the debentures into which the preferred stock was converted by the exchange in 1942, as stated below.

The net economic difference or effect to the preferred shareholders involved in the surrender of readily marketable preferred for such debentures, as agreed to in 1942 under the circumstances to be stated, would, in substance, be the surrender of

voting power inherent in the preferred and the potential loss of redemption premium assuming payment of the debentures at par, at maturity or if extended. Exchange on that basis would, to the extent of the curtailment stated, constitute a net economic detriment or sacrifice to the preferred holder in agreeing to the conversion.

9. From the standpoint of the corporation the existence in 1942 of two classes of stock, common and preferred, held by the stockholders in substantially different proportions, the preferred being without any distributive equity interest in excess of par on liquidation or redemption and 7% per annum until retired or liquidated (plus redemption premium where applicable), subject to redemption only in its entirety and with charter and statutory voting power as stated above, presented a tangible and conventional field for simplification of the corporate capital structure by a recapitalization that would substitute for the preferred stock a non-stock, non-voting debtor security, callable in any amount, leaving no stock outstanding except one class of common stock.

10. In 1940 or 1941, the late Oliver G. Lucas, president of the National Bank of Commerce in New Orleans, which had succeeded the Canal Bank and Trust Company in New Orleans and had maintained banking and business relations with Gulf States since 1933, suggested to the president and to the secretary-treasurer of Gulf States the substitution of debentures for the outstanding preferred stock which had been issued at the instance of the Canal Bank as underwriter of the Gulf States bond issue in 1928.

11. Mr. Lucas recommended an exchange of debentures for the outstanding preferred stock as a legitimate and practical method of reducing corporate taxes, and explained that such method had been adopted by other companies and had been considered and approved by the Bureau of Internal Revenue as a reorganization involving no gain or loss. When suggesting a similar reorganization to the officers of Gulf States, Mr. Lucas did not discuss the matter of exchanging debentures for outstanding preferred stock in connection with the personal ownership of preferred stock by any stockholder and he knew of no tax or other benefit which might conceivably result, if any, to stockholders.

12. The president and the secretary-treasurer of Gulf States considered the suggestion of Mr. Lucas further and after consulting with stockholders and attorneys recommended to the Board that the preferred stockholders should exchange their 7% stocks for 7% debentures in view of the corporate benefit which would result from such an exchange. That action was then approved and the issue of debentures authorized by the Board of Directors of Gulf States on May 19, 1942. The resolution stated that the exchange was desirable and to the best interest of the company and that the debentures were to be offered exclusively to the holders of the preferred stock at the rate of $100 principal amount of the debentures for each share of $100 par value preferred stock, any preferred stock surrendered in exchange to be retired and cancelled.

13. All preferred stockholders accepted the offer, effective May 31, 1942, and each preferred stockholder received debentures in an aggregate principal amount equivalent to the par value of the preferred stock surrendered by him. After the preferred stock had been exchanged and surrendered to the company, the stockholders of Gulf States approved a resolution of the Board of Directors to the effect that the capital of Gulf States be reduced by the amount of $2,500,000 by retiring the entire preferred stock, which was cancelled. A certificate of reduction of capital was filed with the Secretary of State of Delaware and recorded.

14. As authorized by the Board of Directors, the 7% debentures were to mature on May 1, 1947, but could be redeemed in any principal amount desired by the corporation at the rate of $105 for each $100 principal amount prior to maturity. No bookkeeping or accounting changes were made in the corporate surplus account or in the common stock account of Gulf States, the exchange of the preferred stock for the

debentures being recorded by debiting the preferred stock capital account, and crediting a new debenture payable account, with $2,500,000.

15. In 1942 plaintiff held 208 shares of preferred stock (aggregate par value $20,800) and 3,500 shares of common stock in Gulf States, constituting .83% of all issued and outstanding preferred and 1.75% of all issued and outstanding common stock of Gulf States. Accepting the invitation of Gulf States, he surrendered his preferred stock of a par value of $20,800, in exchange for $20,800 principal amount of 7% debentures of Gulf States.

16. Plaintiff had acquired his preferred stock in Gulf States in three different and unrelated transactions by purchasing, for value, stock in the predecessor company and in Gulf States as follows:

(a) On November 30, 1920, he purchased from his employer two shares of the common stock of the predecessor company at a cost of $6,534.35. In 1922 he received 100 shares of common stock of the predecessor company of a par value of $100 per share for the two shares purchased in 1920, the 100 shares being issued to him as the result of a recapitalization of the predecessor company which increased the number of its shares from 400 to 20,000. In 1928 he received 125 shares of 7% preferred stock of a par value of $100 per share and 1,000 shares of common stock without par value of Gulf States in exchange for the 100 shares of (common) stock in the predecessor company. The exchange was made in a reorganization in respect of which no gain or loss was recognized, on the basis of 1¼ shares of preferred stock and 10 shares of common stock of Gulf States for each share in the predecessor company. As of the date of the receipt of the stock of Gulf States in 1928, the preferred stock had a market value of $85 and the common stock had a fair market value of $1 per share, so that the entire preferred stock of Gulf States had an aggregate fair market value of $2,125,000 and the common stock issued had a fair market value of $200,000. The basis

of the 125 shares of Gulf States preferred so acquired by plaintiff is $2,125,000 of
$$\frac{\$2,125,000}{2,325,000}$$
$6,534.35 equal $5,972.25 or $47.778 for each preferred share so acquired.

(b) On or about May 1, 1926, plaintiff purchased 50 shares of the predecessor company's capital stock at $85 per share or a total cost of $4,250, which stock he exchanged in 1928 for 62.5 shares of 7 per cent preferred stock and 500 shares of common stock of Gulf States Paper Corporation. His basis for the said 62.5 shares of Gulf States preferred stock is $62.1505 per share or a total basis for this lot of $3,884.41. The said basis has been determined by use of the allocation formula specified in sub-paragraph (a) above.

(c) On or about March 6, 1939, plaintiff purchased 20.5 shares of Gulf States Paper Corporation preferred stock at $85 per share and received at no cost 164 shares of common stock of the said corporation. Plaintiff's basis for the 20.5 shares of preferred stock so purchased is the cost thereof; that is, $85 per share, or a basis for the 20.5 shares of $1,742.50.

17. The 208 shares of preferred stock in Gulf States, of a par value of $20,800, held by plaintiff which he exchanged for debentures in 1942 had, therefore, in his hands a cost basis of $11,599.16.

18. Between the date of the organization of Gulf States in 1928 and the exchange of the preferred stock in 1942, the ownership of both common and preferred stock in Gulf States changed substantially. Eight stockholders owning 140,150 common shares or more than 70% of the outstanding common stock at the time of the 1928 reorganization had ceased to be common stockholders prior to the 1942 exchange. The total number of stockholders of all classes increased from 21 in 1928 to 32 in 1942, and of the 32 stockholders in 1942, 21 had not been stockholders at the time of the organization of Gulf States in 1928. There was no planned or proximate relation or connection between the original issuance of the preferred stock in the organization of Gulf States in 1928 in which it acquired the

assets of the predecessor company and the subsequent conversion of the preferred stock into debentures, 14 years later, resulting from acceptance by the preferred stockholders of the tender of debentures in exchange for their preferred shares.

19. As at May 31, 1942, ten of the 32 stockholders of Gulf States held the two classes of stock in the same proportion. The holdings of these stockholders aggregated 13.33% of the common and 13.33% of the preferred stock. Four stockholders who held no common stock held 26.04% of the preferred stock of a par value of $651,125. Seven common stockholders owning 18.09% of the common stock held no preferred stock. At the date of the 1942 exchange, 11 stockholders, including plaintiff, owned preferred stock in proportions different from their holdings of common stock; that is, a total of 22 of the 32 stockholders either held only one class of stock or both classes in different proportions. There was, accordingly, no substantial and controlling identity in the ratios of preferred and common held by the plaintiff or the shareholders as a whole.

20. At the time of the 1942 issue of debentures in exchange for preferred stock the dividends on the preferred stock were not in arrears; Gulf States were solvent and currently earning a substantial net income. The president and secretary-treasurer of Gulf States, who had passed the suggestion of Mr. Lucas along to the stockholders, knew of no reason why the current payment of dividends on the preferred stock could not be anticipated in the foreseeable future. The continued payment of 7% dividends on the preferred for an indefinite period ahead appeared practically assured at the time the proposal arose for the exchange. Neither the president, the secretary-treasurer nor any member of their family knew of any economic or tax advantage from the proposed exchange to the holders of the preferred stock, as stockholders. They regarded the intrinsic and market value of the preferred stock as no lower than the value of the debentures to be issued.

21. Aside from the deductibility of the interest on the new debentures as against the non-deductible preferred stock dividend, one effect of the exchange as to the corporation was that whereas the preferred stock could only be called at $105 per share (except in case of the dissolution or liquidation of Gulf States), the new debentures could be paid off at par at the end of the five-year term; therefore, Gulf States could save $125,000 in the event of the retirement of the debentures on maturity. All or a part of the debentures could be paid off prior to maturity at $105, while the certificate of incorporation does not contain provisions permitting a redemption of only a part of the preferred stock.

22. Another effect of the exchange as to the corporation was that the actual and potential voting rights of the preferred stockholders were entirely eliminated. There resulted a functional simplification of the capital structure of Gulf States from the retirement of the preferred, since that action reduced the equity interest in the corporation to a single class of stock, having identical rights and in sole control as to the issue of senior securities, mergers and all matters subject to stockholder control.

23. Plaintiff had never planned nor considered the sale or exchange of his preferred stock until the matter was suggested to him on behalf of the corporation in 1942. He was then informed on behalf of the corporation that the exchange of the preferred stock for debentures was to the advantage of Gulf States and would be without any tax consequences to participating preferred stockholders. Plaintiff regarded the proposed debentures as substantially equivalent in value to the preferred stock. He has never sold or offered for sale any of these debentures, and he was indifferent as to whether his investment be represented by preferred stock or debentures, provided the exchange entailed no tax consequence for him. In reliance on the aforementioned representations plaintiff made the exchange; he recommended to his mother, who also held preferred stock, to do the same, and she followed his advice.

24. Plaintiff neither directly nor indirectly originated the plan for exchange;

he was not responsible for it and he neither received nor attempted to gain any tax or other advantage from the exchange.

No other stockholder—common or preferred—originated or otherwise initiated the exchange for a direct or individual stockholder purpose or for any purpose in the nature of a "bail out." Nor did any shareholder receive any advantage or potential advantage from the exchange which he did not already from a practical standpoint possess, in that the preferred was readily marketable if the holder desired liquidation and dividends of 7% were reasonably assured if he did not. Such ultimate benefits as were realized by common stockholders as a result of the exchange were indirect in that any transaction which benefited the corporation would ultimately inure to the advantage of its equity stockholders.

25. In the opinion of independent and well qualified experts in the appraisal and analysis of corporate and other securities, Gulf States was in 1942 a highly solvent and profitable business and in consideration of all surrounding circumstances the exchange of the preferred stock in 1942 for debentures was an exchange of stock for securities of equal marketability and equal value.

26. After the exchange, Gulf States has continued to operate its business successfully. Aside from paying dividends on its common stock, it paid the interest on the debentures and during the period 1943 to 1950 it spent approximately $7,000,000 on the expansion of its plant capacity. The holders of the original debentures held them until they matured on May 1, 1947, when they accepted an invitation of Gulf States to extend the time for payment of the principal for a term of five years until May 1, 1952, under the original terms of the debentures except that redemption of all or any part of the debentures prior to maturity in 1952 was permitted on payment of the face amount plus accrued and unpaid interest without any premium. Only one holder of $6,450 principal amount of debentures did not agree to the extension and sold those debentures to another debenture holder. Aside from this one transfer in 1947, there had been no other sales or transfers of the debentures until the present time.

27. On or about June 19, 1950, the Commissioner determined against plaintiff the deficiency mentioned, stating:

"It is held that the redemption and cancellation by the Gulf States Paper Corporation during the year 1942, at par value, of $20,800 preferred stock held by you in that corporation represented a distribution essentially equivalent to the distribution of a taxable dividend. Section 115(g) of the Internal Revenue Code [26 U.S.C. § 115 (g)]."

The total deficiency assessed against petitioner in the amount of $17,223.62 above stated was referable to the transaction stated.

28. Other or explanatory findings are as set forth in the accompanying opinion of the Court filed herein.

Conclusions of Law

1. This Court has jurisdiction of this action and of the parties thereto.

2. The exchange in 1942 of the entire preferred stock of Gulf States Paper Corporation in the amount of $2,500,000 for debentures of a par value of $2,500,000 was a genuine reshuffling of the capital structure of that corporation and constituted a reorganization in the form of a recapitalization within the meaning of Section 112(g) (1) (E) of the Internal Revenue Code, 26 U.S.C. § 112(g) (1) (E).

3. If a business or corporate purpose is a requirement of a reorganization in the form of a recapitalization, the requirement is satisfied (a) by the simplification of the capital structure, the elimination of potential differences in interest inherent in the voting power of the preferred and (b) by the successful operation of Gulf States in its recapitalized form from 1942 to date; (c) by the elimination, in 1942, as a result of the exchange, without premium, of the premium for the redemption of preferred stock, and by the final elimination after a period of five years from the date of recapitalization, of any premium for pre-

payment of the substituted debentures; (d) by facilitating the redemption or retirement of the new debentures, which may be retired in installments, as compared with the preferred stock which could be called only in its entirety; and (e) by a substantial saving in corporate taxes, though not in personal taxes of the participating preferred stockholders, since the interest on the debentures, but not the dividends on the preferred stock, constituted a legitimate deduction from the taxable income of the corporation.

4. Since, in pursuance of the plan of reorganization, plaintiff exchanged his 208 shares of preferred stock in the Gulf States Paper Corporation, of a total par value of $20,800, solely for debentures of the same corporation of the total amount of $20,800, and since the debentures are securities in a corporation a party to a reorganization within the meaning of Section 112(b) (3), Internal Revenue Code, no gain or loss is recognized in respect of such exchange.

5. Since the conversion of preferred stock of Gulf States Paper Corporation into debentures of that corporation resulting from the exchange was a reorganization arising under Section 112, Internal Revenue Code, it cannot constitute the equivalent of the distribution of a taxable dividend within the classifications of Section 115(g) of the Internal Revenue Code. Commissioner of Internal Revenue v. Estate of Bedford, 325 U.S. 283, 291, 65 S. Ct. 1157, 89 L.Ed. 1611.

6. The exchange of the entire preferred stock of Gulf States Paper Corporation in the amount of $2,500,000 for debentures of a par value of $2,500,000, resulting in the cancellation of the preferred, accomplished results which could not have been accomplished by the distribution of a debenture dividend. Consequently, such exchange was not essentially equivalent to the distribution of a taxable dividend within the meaning of Section 115(g) of the Internal Revenue Code, Bazley v. Commis-

sioner, 331 U.S. 737, 67 S.Ct. 1489, 91 L. Ed. 1782; moreover, the Gulf States Paper Corporation did not redeem or cancel the preferred stock at such time and in such manner as to make the distribution of the debentures to plaintiff and the cancellation or redemption of his preferred stock, in whole or in part, essentially equivalent to a taxable dividend; nor was the net effect of such exchange of the preferred stock the same as, or equivalent to, the distribution of a debenture dividend.

7. The determination of the Commissioner that the redemption and cancellation in 1942 by the Gulf States Paper Corporation of $20,800 preferred stock held by the plaintiff in that corporation represented a distribution essentially equivalent to the distribution to him of a taxable dividend of $20,800 and the assessment of income tax for 1943 based on such determination are illegal, and plaintiff is entitled to judgment for the amount of $17,223.62 paid on the deficiency assessment and interest thereon, referred to in Findings of Fact No. 3, together with interest on the total amount of the judgment from September 15, 1950.

8. Judgment in conformity with the foregoing findings and the conclusions of law will be entered accordingly, in the amount of $17,223.62 with interest to the date of entry, such judgment to bear interest as provided by law.

## Opinion

The principal issue concerns the tax effect of an exchange of securities of the Gulf States Paper Corporation carried out in 1942,[1] when all of its 7% preferred stock of an aggregate par value of $2,500,000 was converted, by exchange into a like principal amount of its 7% debentures. Plaintiff participated in the transaction and received for his 208 shares of preferred stock, of a total par value of $20,800, new debentures of a total face value of $20,800. The principal characteristics of the preferred and the debentures are stated in the margin.[2]

---

1. The year 1943 is involved because of Section 6(a) of the Current Tax Payment Act of 1943, 26 U.S.C. § 1622 note.

2. The preferred carried the right to cumulative dividends of 7% in preference over

the common but carried no general or participating equity in earnings over that return. The holders were entitled to par and unpaid dividends on liquidation in preference over the common. The pre-

The Commissioner of Internal Revenue determined a deficiency against plaintiff on the ground that the issue of debentures in exchange for the preferred stock effected a distribution of earnings and profits essentially equivalent to the distribution of a taxable dividend to the full extent of the value of the debentures. The preferred stock so exchanged had a market value equal to the debentures received and had a substantial basis in the hands of the holders.

Assuming that the fair market value of the debentures equalled their face value, he determined that in accordance with the provisions of Section 115(g), Internal Revenue Code,[3] plaintiff had received a dividend in the full amount of $20,800, and on that theory assessed a deficiency in income tax for 1943 of $12,391.09. Plaintiff paid the deficiency, as well as interest thereon in the amount of $4,832.53. After his duly filed claim for the refund of those amounts was not acted upon by the Commissioner within six months, plaintiff brought this suit for a refund.

Section 115(g) provides that if a corporation cancels or redeems its stock "in such manner" and "at such time" as to make the distribution and cancellation or redemption in whole or in part "essentially equivalent" to the distribution of a taxable dividend, the amount thus distributed shall be treated as a taxable dividend to the extent that it represents a distribution of accumulated earnings or profits.[4]

Plaintiff contends, generally, that the exchange can not on any theory be regarded as constituting a dividend or distribution of profits and that, in fact, Sections 112(b) (3) and 112(g) (1) (E), exempting from tax certain reorganization exchanges, are controlling here. Section 112(b) (3) provides that "No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securites in such corporation or in another corporation a party to the reorganization." Under Section 112(g) (1) (E) a "reorganization" is defined as includ-

---

ferred stock could be redeemed at par, as an entirety, on payment of a premium of $5 per share plus unpaid dividends. By provision of the charter the preferred was restricted as to voting power except in the event of a proposal to sell all of the assets or in the event of six months default in the payment of preferred dividends. Under the Delaware Corporation Law the holders of the preferred had the right as a class to vote upon and veto any proposed amendment of the charter which would alter or change the preferences, special rights or powers of the preferred so as to affect the preferred adversely, or which would increase or decrease the amount of preferred or the par value (Section 26); and by Section 59 the preferred is entitled to vote on any proposal for merger or consolidation.

The debentures carried a like rate of interest—7%; were payable in five years; on maturity the debentures were extended for a further period of five years. They were payable in whole or in part before original maturity at 105, and on maturity at face. After the extension the debentures were redeemable at face, in any amount.

After payment in 1935 of the remaining outstanding bonds issued in 1928 the

preferred stock became the senior security of Gulf States. When the preferred was surrendered in exchange for the debentures, the latter constituted the senior security.

3. All provisions of the Internal Revenue Code quoted here verbatim are set out as in effect during the year 1943. Section 115(g) reads:

"§ 115. Distributions by corporations
*   *   *   *   *   *

"(g) Redemption of stock. If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend."

4. Since neither party contends to the contrary, it is assumed that during the years 1942 and 1943 Gulf States had sufficient earnings and profits accumulated out of which to make a distribution of dividends in the amount of $2,500,000.

ing a "recapitalization." Plaintiff[5] has consistently taken the position that the changes effected in 1942 in the capital structure of Gulf States constitute a "recapitalization" within the scope of that provision.[6]

The preferred stock of the corporation was exchanged here for debentures of the same corporation.

The debentures here substituted for the preferred stock were evidenced by interest bearing instruments of Gulf States in conventional form and were issued to the registered holders. There seems no doubt but that the debentures were "securities" within the meaning of Section 112(b) (3).[7]

The term "recapitalization" is not defined in the Internal Revenue Code. That the word necessarily has a broad meaning has been recognized, since it is set forth in the statute without qualification. In Commissioner of Internal Revenue v. Neustadt's Trust, 2 Cir., 131 F.2d 528, at page 530, the Court said that "a broad rather than a restricted meaning" is to be ascribed to the word "recapitalization."[8]

The Supreme Court stated in Helvering v. Southwest Consolidated Corporation, 315 U.S. 194, 202, 62 S.Ct. 546, 552, 86 L.Ed. 789, that the term recapitalization means a "reshuffling of a capital structure within the framework of an existing corporation". It has been held in many cases that the term "recapitalization" includes exchanges of stock for debentures of the same corporation. South Atlantic Steamship

Line, 1940, 42 B.T.A. 705; Edgar M. Docherty, 1942, 47 B.T.A. 462, 464;[9] Clarence J. Schoo, 47 B.T.A. 459 (App. dis., CCA 1st, March 29, 1943); Annis Furs, Inc., 2 T.C. 1096 (acq. 1944 C.B. 2). The Commissioner's own ruling, S.M. 3710, IV–1 C.B. 4 (1925) had said that the term signifies "an arrangement whereby the stock and bonds of the corporation are readjusted * * *."

The exchange here involved accomplished, it seems clear, a rearrangement and simplification of the capital stock structure of Gulf States, therefore, constituting a "recapitalization" and, accordingly, a "reorganization" within the meaning of Section 112.

The principal contention of the defendant is that the surrender of the outstanding preferred in exchange for the debentures did not come within the special non-recognition provisions of Sections 112 (b) (3) and 112(g) for lack of business purpose on part of the corporation and for lack of continuity of interest on part of the exchanging shareholders. The defendant next argues that since, as contended by defendant, the gain on the exchange should be recognized it should be taxed under Section 115(g) at the same rates which apply to ordinary taxable dividends.

Before considering in detail the tests for a recapitalization upon which defendant insists, it is well to consider the transaction from the standpoint of the shareholders who exchanged, with a view to assessing the merits of defendant's contention that

5. As well as the other former preferred stockholders of Gulf States.

6. Plaintiff has contended in the alternative that if the recapitalization does not qualify under Section 112(g) (1) (E) as a reorganization the exchange would be one resulting, not in ordinary income or loss, but only in capital gain or loss either as a partial liquidation under Sec. 115(i) or as a taxable exchange within the meaning of Sections 111 and 117.

7. See Helvering v. Watts, 296 U.S. 387, 389, 56 S.Ct. 275, 80 L.Ed. 289. The obligations there recognized by the Supreme Court as securities within the meaning of Section 112(b) (3) of the Revenue Act then in force are described in John J. Watts, 28 B.T.A. 1056, 1059.

8. It is significant that Congress has left unchanged the broad implication in the term "recapitalization" notwithstanding the extraordinary complexity which has arisen out of discussions incident to the progressive effort of the Commissioner to narrow its scope. Illustrative of recent commentaries on the subject are: Nolan, The Uncertain Treatment of Stock Redemptions: A Legislative Proposal 65 Harv.L.Rev. 255 (December, 1951); Michaelson, "Business Purpose" And Tax Free Reorganization 61 Yale L.J. 14 (January, 1952); Golomb, Recapitalization: The Definition Problem, 7 Tax Law 343 (March, 1952).

9. See also Mertens', Law of Federal Income Taxation, Vol. 3, Sec. 20.78.

they received beneficial income or net benefit which could justifiably be recorded and taxed as an ordinary dividend under Section 115(g).

It is defendant's assumption throughout that the corporation lost position and that the preferred shareholders who turned in their shares for cancellation gained an advantage referable to their common stock. It seems to be defendant's contention that such advantage inhered in the issue of an obligation carrying an actionable duty on part of Gulf States to pay interest, in lieu of a stockholder's right under which the corporation had the option, as urged by defendant, to declare or withhold dividends on the preferred, regardless of the adequacy of earnings and regardless of the activation of the potential voting power of the preferred if its dividends were deferred. These contentions lose sight of the practical and tangible economic considerations to which Section 115(g) is peculiarly responsive in determining the question of "net effect" and dividend equivalence.

Section 115(g) deals realistically with the economic factors existing at the time of the redemption. Dividend equivalence is not an abstraction. Whatever the prospective and unforseeable economic factors may have been in 1928 when Gulf States issued its preferred stock as part of a program for a radical change in location and for a new plant and a new and major operation, it is clear from the facts not in dispute here that by 1942 Gulf States had, out of earnings from the new operation since 1928, called and paid off its $2,500,000 first mortgage bonds. It had likewise paid all accumulated dividends on its preferred, in the amount of $2,450,000, some of which had by agreement accumulated since 1928 during the life and in aid of retirement of the bonds. The preferred had thus become the senior security; and the continued payment of dividends on the preferred was, as a practical matter, assured.[10]

While the exchange actually gave rise to important functional consequences as to the corporation, mentioned below, from the standpoint of Section 115(g) there appears to have been no practical economic advantage to the stockholders in acquiring the debentures rather than the preferred. There is no controversy over the conclusion that the debentures had no greater value in the market than the shares of preferred turned in. (Finding No. 23.)

In short, in making the exchange the preferred stockholders who received debentures apparently got nothing which from the practical, economic standpoint of Section 115 (g) was not as fully assured to them had they continued to hold the preferred stock. It may, therefore, well be doubted whether under these circumstances, for the purpose of Section 115(g) or any other dividend provision of the Code, their so-called equity position as preferred stockholders was in any tangible and practical economic respect stepped up or bettered by the exchange of their marketable shares for debentures. That the end results were for all practical purposes identical seems to be clear from these factors:

— the solvency and existing and prospective earnings of the corporation in an amount more than sufficient for preferred dividends or debenture interest had been demonstrated and were reasonably assured;

— the prospective payment of dividends was as reasonably assured as the prospective payment of interest on the debentures;[11]

---

10. This assurance is emphasized by the fact that in addition to the payment of interest on the debentures following the exchange, dividends were paid in 1942 on the common in an amount more than double the preferred dividend requirement; amounting, in fact for 1942 to $400,000, as compared with the annual preferred dividend (or converted debenture interest) requirement of $175,000. Dividends on the common have thereafter continued at the rate of not less than approximately $200,000 annually.

11. The withholding and accumulation of preferred dividends was not a practical prospect nor anything more than a theoretical option or possibility. If such dividends had been withheld for 6 months its dormant voting power would have attached to the preferred and, independently of that potential, if preferred dividends were arbitrarily withheld it would

— the equity as stockholders to receive $105 per share if the corporation elected, at its option, to redeem was precisely the same as the creditor-equity to receive $105 if the corporation should elect to pre-pay the substituted debentures;

— the preferred was a limited, fixed dollar equity, without further participation, precisely as the debentures, in that under no circumstances could the preferred participate in earnings or on liquidation beyond par and accumulated dividends plus the limited redemption premium when applicable;

— and in the event of liquidation the preferred was the senior security entitled to liquidation in full (with accumulated dividends) before any distribution to common stockholders, precisely as if their preferred stock had been obligations (debentures) in the first place.

There were, to be sure, certain aspects of the exchange which were functional from the standpoint of corporate recapitalization although without tangible, economic or market advantage to holders of preferred, in that (a) at maturity, and after the debentures were extended, no redemption premium had to be paid by the corporation to take them up and the corporation actually redeemed the preferred without premium; (b) the exchange simplified the capital structure by getting rid of the statutory and potential charter provisions as to voting power and (c) permitted redemption at any time of any part of the substituted security, whereas the preferred stock had been redeemable only in its entirety. To that extent the holders of the preferred yielded rather than obtained potential advantages. That distinction, bearing in mind the ready marketability of the preferred for par or better, seems necessarily adverse to the notion of a dividend since the concept of a dividend would not ordinarily include a transaction in which the stockholder is required to suffer a net economic disadvantage or net sacrifice to get the dividend.

If all holders of the preferred had simply agreed to waive the premium requirement on their preferred, or their inchoate right to vote if dividends were deferred for over six months, or their statutory right to vote on merger or charter amendments, which was the result of taking the debentures, *it is not likely that the Commissioner would have contended that this surrender of economic position would have constituted a net gain transaction resulting in tax consequences under Section 115(g) or otherwise.* It is difficult to see how dividend equivalence can attach to substantially the same net result in the form of debenture exchange adopted here.

As pointed out above it has necessarily been found (Finding No. 23) that the plaintiff and the holders of the preferred surrendered to the corporation a marketable investment equal in value and marketability to the debentures received in exchange. Indeed, the undisputed evidence of the investment analysts tended to show that the preferred, in view of its implication of a more permanent investment, would be more attractive to a larger class of investors, including insurance companies, trustees and individuals than would the fixed maturity date debentures. It is thus clear that plaintiff and the other preferred stockholders gained nothing of substance in the way of tax or market or financial benefits or advantage by virtue of the exchange. They could have realized on their preferred shares by sale or exchange in the same manner and to the same extent that they could realize on the debentures which took the place of such preferred stock. It was thus not necessary that the preferred stockholders await possible redemption or retirement of the preferred stock by the corporation before cashing in on their investment in such stock. In short, they gained no economic advantage by the fixed maturity date of the debentures nor did they gain any "bail out" mechanism which they did not already possess. Under these circumstances, to hold that the transaction constituted a

seem that declaration and payment could have been enforced. Fletcher on Corpora-

tions, Vol. 11, § 5325; 13 Am.Jur. Corporations, § 707 et seq.

dividend would be "visiting a tax burden upon one who in fact did not, except by construction, derive any beneficial income from the transaction."[12]

A further difficulty in sponsoring the theory of a dividend is the necessity of relating any dividend to some class of stock continuing in existence and not exhausted by the conversion, for the supposed debenture dividend in this matter could not possibly be related to the preferred which it wiped out or to the debentures substituted for the preferred. This fact would compel the allocation of the supposed dividend to the common held by 28 stockholders.

There are organic legal impediments to a corporate distribution of a dividend to the holders of the common not in proportion to their holdings of common but in proportion to their unrelated and disproportionate holdings of preferred which was retired finally by the transaction.

■ The right of the shareholder to dividends in proportion to their shares or interest in the corporation is primary. Accordingly, it is settled law that "Dividends among stockholders must always be pro rata, equal, and without discrimination or preference." Fletcher, Cyc of Corp., Vol. 11, Sec. 5352.

■ In view of this rule it follows that: "* * * The directors have no authority to declare a dividend on any other principle. They cannot exclude any portion of the stockholders from an equal participation in the profits of the company. So the directors cannot discriminate by voting a dividend to certain stockholders only, to the exclusion of others of the same class * *." Id.

In implementation of such rule it is held that

"A bill in equity may be maintained by a stockholder to prevent discrimination or unequal or unfair discrimina-

tion." Id.; See also 13 Am.Jur.Corp., Sec. 717, p. 739.

The anomalous result of trying to relate the supposed debenture dividend to the common stock becomes apparent from analysis of the holding of common and preferred. At the time of the 1942 transaction only ten of its thirty-two stockholders held common and preferred in the same proportions (13%). A substantial amount of preferred ($651,125 par value or 26.04% of the preferred) was held by stockholders who held no common. Seven stockholders, owning 18.09% of common, held no preferred. Eleven stockholders, including plaintiff, owned preferred stock in proportions different from their holding of common. In short, twenty-two out of the thirty-two stockholders held no common or common out of proportion to their holding of preferred.

In Bazley v. Commissioner, 331 U.S. 737, 67 S.Ct. 1489, 91 L.Ed. 1782, strongly relied on by defendant in the case at bar, the taxpayer and his wife owned 999 of a corporation's 1,000 shares of stock. Under a plan of reorganization, they exchanged each share for five shares of new no-par-value stock and new debenture bonds payable in ten years but callable at any time. In holding that transaction was not entitled to the protection of the reorganization sections of the Code, the Supreme Court held that nothing was accomplished by the exchange that could not have been accomplished by an outright distribution of a debenture dividend. That comment could not possibly apply here. The retirement of the outstanding preferred of Gulf States was indispensable to the result actually accomplished. Nor does the instant case involve a corporation which was the alter ego of the plaintiff or of any one of the preferred or common stockholders. No one stockholder held anything like a majority of the voting shares.[13] Cf. Wolf Envelope Company, 1951, 17 T.C. 471. Since

12. Bettendorf v. Commissioner, 8 Cir., 49 F.2d 173, at page 176.

13. Even if the debentures had been "callable at the will of the taxpayer" in the present case that fact would have added nothing new to the strategic position of

the taxpayers here because the liquidity of the taxpayers' preferred stock was equal to that of the debentures which replaced such stock, and ready sale is as good as a call.

that which was accomplished could have been accomplished by the distribution of a debenture dividend, the exchange for debentures was held to be merely a subterfuge, because, as the Supreme Court remarked, the corporation was under the complete control of the taxpayer and his wife and, at his command, could have redeemed the debentures at any time without any effect whatever on the existing pro rata ownership reflected in the common. The two controlling stockholders in Bazley's case simply received a new "equivalent-to-cash" right superimposed upon their undisturbed existing interests. That such an end result did not obtain in the case at bar is clear.

In view of what has been said it is manifest that Bazley's case is without pertinence to the facts involved in the Gulf States recapitalization.

There is a further impediment against the application of the Bazley hypothesis here, viz.: that the same objective result could have been managed merely by the distribution of a debenture dividend. That is not the case.

A distribution of a debenture dividend by Gulf States would have left its preferred stock outstanding and unchanged; the veto power and shift in voting control to the preferred would have remained potential and the statutory rights of the holders of the preferred would have continued in existence.

The company would, as a practical legal necessity, have had to pay the interest ($175,000) on the new debentures and as a matter of charter obligation would have had to pay or account for a cumulative dividend of $175,000 annually to the preferred stockholders before a distribution of dividends to the common stockholders could have been made. That is not what was intended and accomplished here. The necessity for paying a premium for redemption of the preferred and the necessity for redemption of the preferred only

as a whole would have remained. Also the voting (and potential veto) power of the preferred as to sale, merger, amendment of the charter, etc., would have continued in effect.

In Marie W. F. Nugent-Head Trust, 17 T. C. 817, the corporation redeemed part of its preferred stock, such stock and the common stock were not held in the same proportions, the taxpayer in that case holding only preferred stock. The Commissioner determined that a pro rata redemption of a portion of the taxpayer's preferred stock was essentially equivalent to the distribution of a taxable dividend under Section 115(g). The Tax Court disapproved,[14] pointing out that all dividends on preferred stock were paid up at the time of the redemption and that "if the corporation had declared dividends in lieu of redeeming the preferred stock, such dividends could only have been distributed to the common stockholders because all preferred dividends, including arrearages, were paid up." That quotation applies directly to the facts in the instant case.

A final difficulty in applying defendant's theory of dividend equivalence notwithstanding the surrender of the preferred stock is emphasized by the basis question. To obviate confiscation of the basis of the preferred stockholders in the preferred stock surrendered, defendant would have it constructively transferred to their unrelated and disproportionate holdings of the common stock.

The predicament which would result from defendant's contention in the case of the holders of $651,125 par value of preferred who held no common at all, merely points up the unsatisfactory nature of the theory as to transference of basis as a partial justification for insistence here on dividend equivalence. Those who held preferred and no common would, under defendant's theory, lose their preferred investment basis entirely.[15]

14. The redemption in that case was for cash; no exchange for other securities took place; therefore, the taxpayer could not and did not contend that there was a reorganization. Instead, the Tax Court

held that the redemption constituted a partial liquidation under Section 115(c), resulting in capital gain.

15. For example, the record shows without objection that a particular stockhold-

In such cases of disparity in proportional ownership the peculiar problems attaching to the transfer of basis have recently been pointed out by the Tax Court in rejecting contentions of the Commissioner similar to those urged in the case at bar. Thus, in Marie W. F. Nugent-Head Trust, supra, the Tax Court said:

"If such redemptions were held to constitute dividends as regards petitioners herein, a peculiar basis question would arise. Petitioners, prior to any redemptions, held 7,495 shares of preferred stock of the corporation having a basis of $462,741.30. If the distributions to petitioners upon the stock redemptions were held to constitute dividends, the cost basis for such redeemed stock would be allocable to the remaining stock, thus increasing the cost basis per share; and, as the amount of stock approached zero, the basis of the stock per share would reach fantastically high values which could never be recovered."

In John T. Roberts, 17 T. C. 1415, its latest published observation on the matter, the Tax Court also stated:

"By any of the accepted tests this would not require the invocation of section 115(g). Nor will it lead to difficult and possibly inequitable aspects of the problem of basis which would otherwise necessarily arise. See Marie W. F. Nugent-Head Trust, 17 T. C. 817 (Nov. 26, 1951); Katcher, 'The Case of the Forgotten Basis: An Admoni-

tion to Victims of Internal Revenue Code Sec. 115(g),' 48 Mich.L.Rev. 465, 469; Maloney, 'Outline of Points to be Considered in Stock Redemptions,' N.Y.U. Fifth Annual Institute on Federal Taxation, 837, 842; Nolan, 'The Uncertain Tax Treatment of Stock Redemptions,' 65 Harv.L.Rev. 255, 275; cf. also Revenue Act of 1950, section 209, adding section 115(g) (3), Internal Revenue Code."

There thus seems to be no substantial basis for characterizing as having dividend equivalence the 1942 exchange of preferred for debentures.

The dividend equivalence contemplated by Section 115(g) must have some logical relation to the conventional form, notion and effect[16] of a dividend. Otherwise, Section 115(g) is not susceptible to rational understanding and application to any given transaction: which is a requisite for tax, as it is for criminal liability. No such relationship to a dividend seems present here. Not only were the customary indicia of a dividend lacking, but it seems obvious that the issue of debentures was not intended by the corporation, its directors or stockholders to stand alone, separate and apart from the surrender of the preferred. Moreover, the transaction did not have the effect of a dividend since neither preferred nor common stockholders received any net beneficial income by reason of the exchange.[17]

What has been said has reference to the apparent absence from this integral transac-

er, Emma N. Westervelt, held $312,500 par value of preferred stock but no common stock. After the exchange she held only debentures in the same face amount. The Commissioner determined that she received a taxable dividend in the amount of $312,500 upon which he has assessed an income tax of $226,791.09, exclusive of interest. Since there is no common to which the basis could be constructively transferred, that taxpayer could, under the Commissioner's theory, never expect to recover any of the basis of her preferred stock although liable for a confiscatory income tax assessment by virtue of the exchange.

16. As Justice (now Mr. Chief Justice) Vinson stated in Flanagan v. Helvering,

73 App.D.C. 46, 116 F.2d 937, 939: "But the net effect of the distribution rather than the motives and plans of the taxpayer or his corporation, is the fundamental question in administering § 115 (g)."

17. "As the taxpayer may not, in view of the statute, avoid the tax by an artificial device of empty forms * * * so the Government may not * * * impose a tax merely because there has been a stock redemption, where the circumstances are free from artifice and beyond the terms and fair intendment of the provision." Pearl B. Brown, Executrix, 26 B.T.A. 901, 907, affirmed, 7 Cir., 69 F.2d 602, certiorari denied 293 U.S. 570, 55 S.Ct. 81, 82, 79 L.Ed. 669.

tion, of any characteristics of a dividend in the conventional and accepted sense of that term presumptively contemplated by a tax statute in the absence of clear indication to the contrary.

The next question, accordingly, relates to defendant's contention that the exchange transaction is not a reorganization (recapitalization) within the meaning of Sections 112(b) (3) and 112(g) (1) (E).[18]

■ In arguing against classification of the transaction as a recapitalization defendant emphasizes at the outset of his argument the tax saving motive which induced the corporation to propose it. As set out in the findings of fact and commented on in detail elsewhere, the 1942 reorganization of Gulf States accomplished tangible results for the corporation which have no relation to tax saving. But even if tax considerations alone had set the recapitalization of Gulf States in motion, the transaction would not be denied classification as a recapitalization for that reason. The decisive question for determination is "whether what was done, apart from the tax motive, was the thing which the statute intended." Gregory v. Helvering, 293 U.S. 465, 468,[19] 55 S.Ct. 266, 267, 79 L.Ed. 596; or, as pointed out by Judge Hand, infra, whether the transaction had permissible function and result independently of the tax saving.[20]

In this exchange there was, admittedly, no motive or purpose on part of the stockholders, preferred or common, to minimize their individual taxes; and no tax benefit

to them as individuals or as stockholders was inherent or potential. They were invited to agree to the exchange for the benefit to accrue to the corporation from a reduction in the corporation's future tax burden so long as the debentures might remain outstanding. The anomalous result insisted upon by the defendant is, accordingly, that the holders of the preferred stock who had no tax motive and gained no tax benefit, current or prospective, would take the full consequences of a matured liability for taxes as if they were the intended beneficiaries and realized benefit, tax or otherwise, from the arrangement. That result would invite scrutiny.

■ Turning to the corporation and conceding the future tax saving motive as to the corporation, was everything else mere form; or was there corporate function and substance aside from the prospective tax saving?

The minutes of the meeting of the board of directors of May 19, 1942, though making reference to the tax saving resulting under the plan of reorganization, mention also generally that the plan would be to the advantage of the company. The absence or presence of argumentative recitals is not important, since tax administration is concerned with what was done. It seems sufficiently clear here that whatever the primary or even dominant motive, the plan and transaction as executed functioned to accomplish internal corporate results other than a mere tax saving which without the "reshuffling" transaction could not have

18. If the transaction constituted a reorganization (recapitalization), Section 115 (g) would not be applicable. Commissioner of Internal Revenue v. Estate of Bedford, 325 U.S. 283, 289, 65 S.Ct. 1157, 89 L.Ed. 1611.

19. Cf. Judge Learned Hand in Helvering v. Gregory, 2 Cir., 69 F.2d 809, 810, 811: "We agree with the Board and the taxpayer that a transaction, otherwise within an exception of the tax law, does not lose its immunity, because it is actuated by a desire to avoid, or, if one choose, to evade, taxation. Any one may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose that pattern which will

best pay the Treasury; there is not even a patriotic duty to increase one's taxes. United States v. Isham, 17 Wall. 496, 506, 21 L.Ed. 728, * * *." Affirmed in Gregory v. Helvering, supra, by the Supreme Court.

20. "* * * Had they really meant to conduct a business by means of the two reorganized companies, they would have escaped whatever other aim they might have had, whether to avoid taxes, or to regenerate the world." Judge Learned Hand in Chisholm v. Commissioner, 2 Cir., 79 F.2d 14, at page 15, 101 A.L.R. 200, certiorari denied 296 U.S. 641, 56 S.Ct. 174, 80 L.Ed. 456.

been accomplished and which the board of directors could reasonably regard and adopt as beneficial to the company. These aspects have been summarized above. Specific elaboration may be justified in view of the decisive importance of the question. These corporate results attached immediately on the conversion of the preferred stock into debentures. The tax saving was contingent and prospective, dependent upon the debentures remaining outstanding.

(a) Except in case of the dissolution or liquidation of the corporation, the preferred stock could, under the charter provisions, be redeemed only on payment of a premium of $5 a share. The certificate of incorporation of Gulf States contained no provision permitting the redemption of the preferred stock other than by redeeming the entire issue of $2,500,000. On the other hand, the debentures which were substituted for the preferred stock were redeemable at any time but the premium of $5 for each $100 face amount was applicable only if redeemed prior to maturity,[21] in 1947. Nothing prevented Gulf States from paying the debentures at par on maturity, without a premium, or from agreeing upon an extension (as it did) without provision for any redemption premium; or from redeeming the debentures prior to maturity, whether before or after the extension, in such amounts, although less that the whole, as appeared convenient to the company. The potential obligation to pay a total premium of $125,000 to retire this preferred stock, with all of its consequences, was finally removed as to that security by its redemption, without premium. The substituted premium requisite to payment of the debentures was made contingent on pre-payment before the original date of maturity; and disappeared on the extension of the issue without the premium requirement.

(b) In addition, the redemption of the preferred stock materially simplified the capital structure, effective when the transaction was closed, by eliminating the actual and potential voting power of the preferred stockholders after the initial uniformity in proportionate holdings of preferred by common stockholders had been materially altered during the 14 years since the preferred was originally issued. Although the preferred holders had no economic equity in the corporation in excess of par (and a possible redemption premium) and a fixed dividend of 7%, and no general voting power, they had the charter right to vote if the business of the corporation were to be sold as an entirety and on all matters just as the common stockholders if the preferred dividends should remain in arrears for a period of six months. In addition to these express charter powers, there existed in the holders of the preferred stock under the corporation law of Delaware statutory rights of fundamental importance which were removed by the transaction. These are too customary to elaborate in detail.[22]

There is significance in the fact above mentioned, that on the organization of Gulf States in 1928, no preferred stock was proposed until its issue was requested by the Bank proposing to underwrite the bonds, as a frozen capital support of the bonds. After the bonds were called and paid off the original purpose of the issue of preferred became obsolete. Meanwhile, the initial (1928) identity of proportionate

21. When the debentures matured in 1947, the debenture-holders agreed to extend the maturity by five years and to drop the premium of $5 entirely.

22. For illustration Section 26, Del.Corp. Law, contained this proviso, Code of 1935, Chapter 65, Section 2058: "provided, however, that if any such proposed amendment would alter or change the preferences, special rights or powers given to any one or more classes of stock, by the Certificate of Incorporation, so as to affect such class or classes of stock adversely, or would increase or decrease the amount of the authorized stock of such class or classes of stock, or would increase or decrease the par value thereof, then the holders of the stock of each class of stock so affected by the amendment shall be entitled to vote as a class upon such amendment, whether by the terms of the Certificate of Incorporation such class be entitled to vote or not".

Reference has been made to the statutory rights of preferred stockholders in the event of merger or consolidation.

ownership between common and preferred stockholders had, at the time of the exchange in 1942, changed into a material disparity in such proportionate ownership. The exchange transaction restored and perpetuated in the common an identity in stockholder interest.[23]

The reality and genuineness of the reorganization (recapitalization) effected in 1942 is further evidenced and supported by the pragmatic fact that it was made effective, actually and not merely ostensibly, and that it functioned satisfactorily and is in no sense a sham. Nor was it made contingent on any tax saving subsequently to be realized. Gulf States has continued to exist and to operate its business successfully under this recapitalized structure. Chisholm v. Commissioner.[24] See also Survaunt v. Commissioner, 8 Cir., 162 F.2d 753, 758.[25]

For the reasons stated the conclusion points to recapitalization within the fair intendment of the term. Defendant urges that the conversion of preferred into debentures interrupted a necessary "continuity of interest" thought to be a requisite to qualify a recapitalization. It does not seem that this supposed requirement can survive a discriminating analysis of the problem as it arises here.[26]

In other words, there appears nothing in the broad term "recapitalization" or in the effective simplification of capital structure accomplished by the transaction under review to require any arbitrary continuity of interest in the case of an internal reorganization (recapitalization) involving a single corporation. Cf. Commissioner of Internal Revenue v. Edmonds' Estate, 3 Cir., 165 F.2d 715.

If, in theory, continuity should be required it would seem that the interest of the holders of a preferred stock limited to fixed dividends and par was fairly reflected in the highly equivalent characteristics of the debentures into which the preferred was converted. Clarence J. Schoo and Annis Furs, Inc., supra.

Since it is determined that exchange of the preferred stock for the debentures is governed by Section 112 and is therefore not a taxable distribution within the scope of Section 115,[27] the resulting gain or loss, if any, is accordingly not recognized. Under the statute the taxability of the transaction is postponed to a later disposition

---

23. In its recent decision in Wolf Envelope Company, supra, the Tax Court refers to and reaffirms its own prior decisions to the effect that it is a sufficient and valid purpose of reorganization if an exchange effects a shift in voting rights as between one group of stockholders and another. See also Marjorie N. Dean, 10 T.C. 19; and Elmer W. Hartzel, 40 B.T.A. 492.

24. Footnote 20, supra.

25. "The 'business purpose' requirements for corporate reorganizations under § 112 (g) are discussed at length and the cases reviewed by Judge Mahoney in Lewis v. Commissioner, 1 Cir., 160 F.2d 839, 843, where the conclusion is reached that 'Usually * * * the continuance of the business in the hands of the transferee (or by a reorganized company in the case of a recapitalization) is deemed sufficient indication of the required "business purpose" and the Treasury Regulations * * * [103, § 19.112(g)-1] list this as a requirement of the statutory reorganization.' And see Lyon, Inc., v. Commissioner, 6 Cir., 127 F.2d [210] at page 213."

26. Griswold "Securities and Continuity of Interest", 58 Harv.L.Rev. 705, where the author states (p. 717): "But the Le Tulle case [Le Tulle v. Scofield, 308 U.S. 415, 60 S.Ct. 313, 84 L.Ed. 355] should not be applied, and has not been applied in these recapitalizations. Congress has not enacted a continuity of interest requirement in terms, and there is no basis for reading it into the word 'recapitalization' as there was in the case of the phrase 'merger or consolidation'."
See also Golomb, supra, note (8) where it is said: "* * * it seems clear that there is no basis for subjecting (E) to any continuity test whatsoever—and certainly not to one derived from a now nonexistent clause in another part of the Section [112 G(1)]" 7 Tax L.Rev. at p. 344.

27. "But the classifications of § 115, which governs 'distributions of corporations' apart from reorganizations, were adopted for another purpose. They do not apply to a situation arising within § 112." Commissioner of Internal Revenue v. Estate of Bedford, 325 U.S. 283, 291, 65 S.Ct. 1157, 1161, 89 L.Ed. 1611.

312

of the debentures whereby gain or loss is realized.[28]

In view of this conclusion, it is unnecessary to pass on plaintiff's alternative contentions except to observe that if the exchange were not covered by Section 112(b)(3), it could result only in capital gain or loss to the plaintiff either as a distribution in partial liquidation[29] of Gulf States, or as an ordinary exchange in which gain would be recognized[30] on that basis and not as a dividend.

Since no gain or loss is recognized as a result of the exchange of plaintiff's preferred stock for debentures, judgment for plaintiff will be entered in accordance with the findings and conclusions filed herewith.

---

28. Since no gain or loss is recognized, the issuance of the debentures to plaintiff, as well as to the other former preferred stockholders, does not affect the earnings and profits of Gulf States. Section 115 (h).

29. In a number of recent decisions involving the redemption of stock or part of the stock for cash, the Tax Court rejected the Commissioner's determination that there was a distribution taxable as a dividend under Section 115(g) and held, instead, that there was a partial liquidation; for instance, Clarence R. O'Brion, T. C. Memo Decision, Docket No. 24050,

entered Nov. 30, 1951; John L. Sullivan, 17 T.C. 1420; and John T. Roberts, 17 T. C.No. 1415, where the Tax Court explicitly found that "the operations of the corporation were not impaired by reason of the transaction in controversy [the redemption of stock], and it has never followed a policy of contraction of business."

30. The Tax Court so held recently in Carter Tiffany, 16 T.C. 1443. See Sections 111, 112(a), 117, of the Internal Revenue Code. An exchange, if gain or loss is recognized, is treated in the same way as a sale.