GEORGE H. CHISHOLM, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

HARRY L. CHISHOLM, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 61664, 61665. Promulgated February 28, 1934.

*Joseph H. Morey*, *Esq.*, and *W. W. Spalding*, *Esq.*, for the petitioners.

*Mason B. Leming*, *Esq.*, for the respondent.

1336

OPINION.

ARUNDELL: It is alleged in each case that the respondent erred in determining that the sale of Houde Engineering Corporation

stock was made by the petitioner, when in truth and in fact the sale was made by the partnership of H. L. & G. H. Chisholm, and the purchase price was received by the partnership.

There is no question but that the sale of the stock was, in form, a sale by the partnership. On the date that the stock was transferred to the purchaser the certificate for the 600 shares was in the name of the partnership, the certificate was endorsed over to the purchaser by the partnership, and the check for the sale price was made payable to and was received by the partnership. If we went no further into the matter than this and gave consideration only to the form of the transaction, we would be obliged to say that there was a sale by the partnership and the gain or loss thereon was that of the partnership. The Commissioner, upon consideration of the facts, concluded that the sale was made by the petitioners, individually, and not by the partnership, and determined that the difference between cost to the individual petitioners and the sale price was income to them. The difference between cost to the individuals and the selling price is much greater than the difference between value of the stock when the partnership was formed and the selling price; hence, the income on the basis of a sale by the individuals is a higher amount than on a sale by the partnership. See *Edward B. Archbald*, 27 B.T.A. 837. Our task is to decide whether the Commissioner erred in his determination. In so doing it is obvious that we are not required to stop short with the surface indications of the case, but it is our right and duty to examine all the surrounding circumstances to find the substance of the matter, for, as has often been said, it is substance and not form that controls in the application of tax laws. *United States* v. *Phellis*, 257 U.S. 156. We should especially not be blinded by form and lose sight of the substance where, as here, the cloak of formality is donned for the express purpose of tax avoidance. The avoidance or reduction of taxes effected through legal means is not prohibited, *United States* v. *Isham*, 17 Wall. 496, and if the method used, whether a partnership or some other device, is a bona fide transaction occurring in the ordinary course of business and reflects the real rights of the parties, the tax must be levied accordingly.

The question that arises here is not whether legal means were used to avoid tax; it is whether, at bottom, the intent of the petitioners was to make a bona fide transfer to a new entity so that it in truth and in fact was the owner of the property and entitled to enjoy the income from the sale as its own, or whether this entity of their creation was merely a conduit used for the purpose of passing title and receiving the proceeds of the sale for the petitioners as beneficial owners.

The events with which we are concerned, all occurring in 1928, were as follows in chronological order:

September 26—Execution and delivery of thirty-day option.

October 11—Notice from optionee of election to exercise option.

October 20—Stock endorsed over to partnership; formal assignment of stock and interest in " option contract " to partnership; partnership agreement signed.

October 22—Execution of partnership agreement acknowledged before notary public; notice to optionee and prospective purchaser of assignment to partnership; certificate for 600 shares of stock issued to partnership; certificate for 600 shares assigned, by endorsement by partnership, to purchaser and delivered to bank in escrow.

October 23—Receipt of earnings statement of Houde Corporation for period September 1–October 11.

October 24—Check for $1,004,849.04 issued to partnership by purchaser of the stock; receipt for that sum executed by partnership.

October 25—New stock certificate issued to purchaser.

It is claimed by petitioners that the letter of October 11 from the optionee was not an effective exercise of the option, because the option called for " payment of cash " and the cash was not produced and tendered with the letter. There are numerous cases to the effect that an option must be exercised in strict accordance with its terms. See *Crancer* v. *Lareau*, 1 Fed. (2d) 117, and cases there cited. However, we do not understand this to be decisive of the questions here mentioned. Most of the cases cited to us deal with questions of specific performance and there is no such issue here. It is not claimed that the option given by petitioners and others was allowed to lapse and no performance had under it. In *Lucas* v. *North Texas Lumber Co.*, 281 U.S. 11 (affirming 7 B.T.A. 1193), the option specified a cash consideration for timber lands and timber rights and within the period of the option the optionee gave notice that it would exercise the option and would pay over the money " as soon as the papers were prepared." The Supreme Court said that "An executory contract of sale was created by the option and notice  *  *  *." And so, even though there was no sale of the stock at October 11, when the stock was still in the name of petitioners, the acceptance of that date together with the option did constitute an " executory contract of sale." This contract, through the subsequent acts of the interested parties, including petitioner's assignee, which they completely controlled at all times, within a few days was converted into an executed contract of sale. The assignee partnership, which it must be remembered consisted only of the two petitioners and so was dominated by them, entered into no new contract for the sale of the stock, but merely at the direction of the petitioners carried out their prior engagement. There is testimony that petitioners had for several

months considered the advisability of forming a partnership, but it is admitted that the imminence of the sale of the Houde stock was the immediate occasion for its formation, and that it probably would not have been formed when it was except for the prospective tax liability. Their obvious purpose was to escape the tax on the profit from the sale. In these circumstances a proper regard for the substance of the transaction impels the conclusion that the partnership was acting on behalf of the individuals in taking title to and selling the stock. Under somewhat similar facts, but where the control over the recipient of proceeds was more remote than that of partners over partnership income, it has been held that recipient was nothing more than an agent, or conduit for passing title and receiving the money, for the real party in interest. In *J. L. McInerney*, 29 B.T.A. 1, the petitioner had made an oral agreement to sell certain properties, both real and personal. Shortly thereafter his attorney caused to be organized a corporation which was controlled by the attorney. Petitioner then executed a bill of sale for one half the personalty to his wife and through an intermediary had the realty deeded to himself and his wife. He and his wife then offered to sell the entire property to the newly organized corporation, controlled by petitioner's attorney, which offer was accepted and the new corporation then sold the property to the purchaser with whom petitioner had made the oral agreement to sell. The new corporation received the proceeds of the sale and paid a portion thereof to petitioner. We held that all of the profit on the sale was taxable to the petitioner. As to the corporation organized and controlled by petitioner's attorney, we said that it " was created for the sole purpose of passing title in the properties * * * and passing payment therefor to petitioner. * * * As a conduit, it received * * * the purchase money due petitioner." Respecting the bill of sale and deed to petitioner's wife just prior to the sale, we pointed out that when these were given all arrangements for the sale had been made; it remained only to pass title and receive the consideration, and the sale was carried out as arranged. We concluded that:

> The transfers were a subterfuge, effected upon the eve of the consummation of the sale in the hope that it would serve to avoid a part of the tax to be imposed upon the profit derived therefrom. We conclude that the real owner and vendor of the properties was petitioner, and that the entire profit is taxable to him.

In *Nace Realty Co.*, 28 B.T.A. 467, the petitioner corporation owned a leasehold which it contracted to sell, the purchase price to be paid upon delivery of a proper deed. The petitioner then assigned the leasehold to its two stockholders, who a few days later

assigned it to the purchaser and received the purchase price. We held the entire profit to be taxable to the corporation, saying that "A reasonable view of the substance of the transaction demands that we regard the individuals as acting on behalf of the corporation in taking title to and disposing of the lease."

In *S. A. MacQueen Co.*, 26 B.T.A. 1337; affd., 67 Fed. (2d) 857, a corporation, on February 1, 1927, agreed to sell its property to its principal stockholder, MacQueen, for $85,000. The next day MacQueen agreed to sell the property to one Hatfield for $150,000. The transfers from the corporation to MacQueen and from him to Hatfield took place on March 1, 1927. On February 11, 1927, MacQueen executed an instrument wherein he declared that the profit on the transaction was to be received by him in trust for the stockholders of the MacQueen corporation. The Commissioner added the $65,000 profit to the income of the corporation, and we sustained his action on the theory that the transfer to MacQueen was merely one in trust. Our decision was affirmed on appeal, the Circuit Court saying:

> Although in form there were two sales of the corporation real estate, first the purported sale by the petitioner to MacQueen, and, second, the sale by MacQueen to Hatfield, in substance the transaction was a sale by the petitioner to Hatfield through the agency of MacQueen. So also, although in form MacQueen was a trustee for the distribution of the profits earned by the sale of his own real estate to Hatfield, in substance he was the agent of the petitioner for the distribution of the profits from the sale of the corporation's real estate among its stockholders.

> The corporate tax rate imposed by the applicable taxing statutes is higher than the individual rate. The obvious purpose of the procedure followed by the petitioner, its directors, and stockholders, was to take advantage of the lower tax rate permitted individuals and thereby avoid the corporate tax rate on the profits of the ultimate sale of the real estate. Such anticipatory arrangements and contract, intended to circumvent the taxing statutes, are not looked upon with favor. *Lucas* v. *Earl*, 281 U. S. 111. *Phelps* v. *Commissioner*, 54 Fed. (2d) 289, certiorari denied, 285 U. S. 558.

The principle of the above cases we think should control those before us here. The evidence is that petitioners had offered to sell their property, that they were in receipt of a written acceptance, and that they caused their part of the bargain to be carried out through a partnership of which they were the only members. The intervention of the partnership was nothing more than an anticipatory arrangement " intended to circumvent the tax statutes." The partnership was not a bona fide owner of property acquired in the ordinary course of business. The petitioners were the real owners and vendors of the stock, using the partnership as an instrumentality for passing title and receiving the proceeds for them.

Our conclusion is in harmony with decisions of the Supreme Court, which have refused to give effect to transfers not in the ordinary course of business but resorted to solely for the purpose of escaping tax. Some devices for reduction or avoidance of taxes are, in the language of Mr. Justice Holmes in *Bullen* v. *Wisconsin*, 240 U.S. 625, on the "safe side", while others fall on the "wrong side of the line indicated by the policy if not by the mere letter of the law." In judging upon which side of the line a given act falls, a distinction may well be taken according to whether it is within the scope of the normal operating methods of the taxpayer with no more than a change in form so as to minimize future taxes, or whether the procedure adopted represents a radical departure from normal methods for the sole purpose of escaping taxes on transactions already carried so close to consummation that the shadow of taxation hovers over them. Such is the trend of the court decisions as we read them. Typical of the one class of cases is *United States* v. *Isham, supra,* where a corporation in the normal course of its business operations issued drafts drawn in such form as to fall outside the scope of the language of the statute designating certain kinds of drafts as subject to a stamp tax. That course of conduct, the Court said, was open to no legal censure. The decision there was put upon two grounds. First, that the drafts so drawn did not come within the several classes of instruments described in the statute as subject to tax. This follows the rule that the taxing statutes are construed most strongly against the Government. Second, that a holding which would bring such instruments within the scope of the statute, when on their face they were outside the list of taxed papers, would require an investigation into every paper presented in the form of nontaxable drafts or checks to see whether it was subject to tax, and that this " would produce difficulties and inconveniences vastly more injurious than that complained of. Such a rule would destroy the circulating capacity of bills, or drafts or orders. * * * That the rule contended for is impracticable in a commercial country is too obvious to require further illustration." Considering the decision of the Court in the light of the facts in that case, we think it cannot with any show of reason be said to give unqualified approval to all cases of tax avoidance through means of legal forms. On the contrary, the reports contain numerous instances of transactions on the "wrong side of the line", which have been condemned as evasions although carried out through legal forms. Notable cases are those where persons normally carrying substantial bank balances converted their deposits into United States notes shortly prior to the date for assessment of personal property under state taxing statutes,

solely for the purpose of escaping taxation. In one such case, *Mitchell* v. *Commissioner*, 91 U.S. 206, the taxpayer filed a bill in equity to restrain collection of the tax asserted against the amount of his bank balance so converted. The Supreme Court, sustaining a dismissal of the bill by the state court, said that " a court of equity will not knowingly use its extraordinary powers to permit any such scheme as this plaintiff devised to escape his proportionate share of the burden of taxation. His remedy, if he has any, is in a court of law." Later another such case, *Shotwell* v. *Moore*, 129 U.S. 590, reached the Supreme Court through the law courts, and the conduct of the taxpayer was there condemned as severely as in the equity case. While the decision of the Court, in holding the device ineffectual, was based on the ground that the state statute was valid, it is significant that a large part of the opinion is devoted to numerous authorities to the effect that, since the transaction of conversion of the bank deposit into greenbacks was transitory and not in the ordinary course of business, it was an indefensible evasion of the revenue laws of the state. In the course of the opinion the Court concedes the proposition advanced that the state tax laws could not reach the United States " greenbacks " owned by the taxpayer on the day of assessment, but adds this important qualification: " *if the thing done had been done in the ordinary course of business*, and the conversion of his general deposit in the bank into a private package of greenbacks, exempt from taxation, were free from illegal purpose or fraudulent motive." (Italics ours.) To the claim that a property owner in such cases might have relief in a court of law as distinguished from a court of equity, the Supreme Court, after citing several cases, including the *Mitchell* case, *supra*, answered:

All these decisions show that the courts look upon this transaction as indefensible, and consider it an improper evasion of the duty of the citizen to pay his share of the taxes necessary to support the government which is justly due on his property.

From the above cases we think it may be taken as the announced policy of the courts, both in cases at law and in equity, that they will not countenance a scheme to escape taxes which involves an abrupt departure from normal procedure, devised and adopted with reference to a transaction upon which the imposition of tax is imminent, and solely for the purpose of avoiding liability.

Such is the case here. The petitioners owned property which had cost them $16,000 and which they were about to sell for more than $1,000,000. They had been notified that the deal would be consummated and they were dealing with men who they believed were financially responsible. The tax on this transaction, if consummated, would be high. So in order to escape their just share of tax to which

1346

their profit would be subject, upon advice of their attorney, they transferred the property to an entity created and controlled by themselves from which at any time they could take the entire proceeds of the sale.

The transitory holding of title by the partnership under these circumstances may not be regarded as a matter of substance which changed the substantive rights or tax liability of the real owners and vendors of the property, and the plan resorted to should not be permitted to alter the tax liability of petitioners upon income from the sale of their property.

Our holding herein is not contrary to cases cited by petitioners. See *Charles W. Walworth*, 6 B.T.A. 788; *J. V. Leydig*, 15 B.T.A. 124; affd., 43 Fed. (2d) 494; *Leonard Marshall Wright*, 26 B.T.A. 21. The evidence in those cases satisfied us of bona fide transfers pursuant to prior agreements, and it did not appear that the income from the property transferred was subject to the control of the transferor to the extent that it was here by reason of petitioners comprising the entire partnership.

We accordingly affirm the action of the respondent in treating as income to petitioners the difference between cost to them of their stock and the price paid by Cooley, the purchaser.

Reviewed by the Board.

*Decision in each case will be entered for the respondent.*

---

GOODRICH, dissenting: I disagree with the majority opinion in laying as a test for successful tax avoidance the adherence by the taxpayer to the so-called normal procedure in the conduct of his affairs. In the first place, from the number of controversies involving avoidance attempts, it might well be argued that the normal procedure of most taxpayers in the conduct of their affairs includes any acts necessary to carry out a determination to pay taxes in such amounts as the law demands, and no more—a fact of which the majority opinion takes no cognizance.

Next, I do not understand that a taxpayer must sit by idly twirling his thumbs until a tax liability alights upon him. If he is warned of its approach, if he sees it coming, he may seek such shelter as the law offers in an effort to escape it or diminish its blow. Of course, by examination, it must be determined whether the shelter he reaches is really constructed of statutory material, and by close scrutiny of the facts it must be determined whether the taxpayer really got himself and his transactions within it. But he should not be counted out merely because the shelter lies off his beaten path and he scurries for it.

The suggestion of the majority that every taxpayer must needs plod along the path laid by the past requirements of his business, meeting and paying any and all tax liabilities encountered, is highly Utopian—at least from the governmental viewpoint—and offers an ethical canon, interesting but quite beyond the necessities of decision in the instant controversy. Apparently it does not recognize that high taxes, like high water, may make an old path unusable, nor that on occasion a new path may be charted during the survey preliminary to entering upon a transaction in order to reckon with the tax demands certain to come. To say that the old path must be blindly followed, that bypaths or new paths may not be laid out by proper strides within legal bounds, goes too far.