GOLDEN NUGGET, INC., AND SUBSIDIARY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 8027–81, 11098–83.     Filed July 18, 1984.

*Martin T. Goldblum,* for the petitioner.
*Cruz Saavedra,* for the respondent.

OPINION

FEATHERSTON, *Judge*: Respondent determined deficiencies in petitioners' Federal income tax as follows:

| Year | Deficiency |
| --- | --- |
| 1975 | $12,974 |
| 1976 | 12,974 |
| 1977 | 12,973 |
| 1978 | 12,973 |

The only question for decision is whether there was original issue discount, as defined in section 1232(b)(1),[1] with respect to debentures issued by petitioner in 1974 in exchange for a portion of its common stock in the transaction more fully described below. The resolution of that question will require us to decide whether that transaction was a reorganization in the form of a recapitalization within the meaning of section 368(a)(1)(E).

All of the facts are stipulated.

Petitioner Golden Nugget, Inc., which had its principal place of business in Las Vegas, NV, when it filed its petition, is the parent of an affiliated group of corporations filing consolidated Federal income tax returns with the Internal Revenue Service Center, Ogden, UT. Golden Nugget, Inc.'s subsidiary is also a petitioner in this case, but hereinafter all references to "petitioner" in the singular will refer only to Golden Nugget, Inc., because only its affairs are involved in the present controversy.

In September 1974, petitioner had outstanding 1,592,321 shares of common stock with a par value of $2.50 per share. The stock was publicly traded on the Pacific Stock Exchange. From the beginning of 1974 through September 20 of that year, its price on the exchange ranged from a low of $5.125, to a high of $7.50 per share.

On October 1, 1974, petitioner made an offer to its shareholders to exchange $10 principal amount of newly issued 12-percent subordinated debentures due in 1994 (the debentures) for each share of petitioner's common stock. The debentures were redeemable by petitioner at its election at any time after October 15, 1975. The purpose of the exchange offer, as set forth in an offering circular dated October 1, 1974, was as follows:

Purposes of Exchange Offer

Management believes that the GN Common Stock is presently undervalued and that its purchase for a consideration consisting of the Debentures will benefit the Company, its remaining stockholders and the Debenture holders. Management also believes that it is in the best interests of stockholders to afford them a choice either to become holders of the Debentures, or to remain stockholders subject to possible increased risks and

---

[1] All section references are to the Internal Revenue Code of 1954 as amended, unless otherwise indicated.

potential for increased benefits that may result from the increased indebtedness of GN resulting from the issuance of the Debentures and the concomitant decreased amount of GN Common Stock to be outstanding. In addition, management believes that future discussions concerning sale of the Company, if any, would involve terms more favorable to remaining stockholders than would have been the case had the Exchange Offer not been consummated. There are at present no such discussions. * * *

Petitioner agreed to accept all shares which were tendered up to 400,000 and had the option to accept any shares in excess thereof up to a total of 800,000 shares.[2] Pursuant to the exchange offer, petitioner acquired a total of 181,718 shares of its common stock by the end of October 1974 (the 1974 exchange). The shares were not retired but were held by petitioner as treasury stock.

At the time of the exchange offer, the value of the common stock, based on the price at which it was traded on the Pacific Stock Exchange, was somewhat in excess of $7 per share. The excess of the principal amount of the debentures ($10 principal amount for each share of stock) over the market value of the common stock acquired by petitioner amounted to $540,573 (the discount amount).

After the 1974 exchange was consummated, petitioner claimed deductions for the amortization of the discount amount for the remainder of 1974 and for the balance of the period here in controversy. The determined deficiencies arise from the disallowance for each year in dispute of $27,029 deducted by petitioner as amortization of the discount amount.

Section 163(a) provides for the deduction of "all interest paid or accrued within the taxable year on indebtedness." If a bond

---

[2]The offering circular also set forth the opinion of petitioner's counsel as to the Federal income tax consequences of the proposed exchange including the tax consequences of original issue discount. The opinion of counsel, as set forth in the offering circular, stated:

"4. If the fair market value of the Debentures on the Expiration Date is less than their principal amount, the excess of the principal amount over their fair market value on such date (the "original issue discount") will be required to be taken into ordinary income by each holder of a Debenture, ratably each year over the period remaining to the maturity of the Debenture, so long as such holder continues to hold the Debenture. * * *

"5. The Company will recognize neither a gain or a loss on the Exchange Offer for federal income tax purposes. However, the Company will be entitled to an income tax deduction for any original issue discount which may be includable in the income of the holders of the Debentures as set forth in Paragraph 4 above."

Petitioner entered into the exchange with the expectation, based upon the advice of counsel, that for Federal income tax purposes it would be entitled to deduct any original issue discount arising on the issuance of the debentures ratably over the life of the instruments.

is issued for an amount less than its face amount, the amount of the difference, called "original issue discount," represents interest expense and may in general be amortized and deducted as interest over the life of the obligation. See *Commissioner v. Nat. Alfalfa Dehydrating & Milling Co.*, 417 U.S. 134, 145 (1974); *Helvering v. Union Pacific Co.*, 293 U.S. 282, 284 (1934); *Seaboard Coffee Service, Inc. v. Commissioner*, 71 T.C. 465, 470 (1978); sec. 1.163–4(a), Income Tax Regs.[3]

The term "original issue discount" is defined in section 1232(b)(1) as the "difference between the issue price and the stated redemption price at maturity." The "issue price" of bonds issued for property other than money was defined in section 1232(b)(2), in pertinent part, as in effect for the years in question, as follows:

In the case of a bond or other· evidence of indebtedness, * * * (other than a bond or other evidence of indebtedness * * * issued pursuant to a plan of reorganization within the meaning of section 368(a)(1) * * *), which is issued for property and which—
    (A) is part of an issue a portion of which is traded on an established securities market, or
    (B) is issued for stock or securities which are traded on an established securities market,
the issue price of such bond or other evidence of indebtedness or investment unit, as the case may be, shall be the fair market value of such property. Except in cases to which the preceding sentence applies, the issue price of a bond or other evidence of indebtedness * * * which is issued for property (other than money) shall be the stated redemption price at maturity.

See also sec. 1.1232–3(b)(2)(iii), Income Tax Regs.

Thus, where the "established securities market" requirement of section 1232(b)(2) was satisfied and the bond was not issued pursuant to a statutory reorganization, the issue price of a bond issued for property was the property's fair market value; in those circumstances, the difference between the fair market value of the property and the principal amount of the bond was original issue discount. On the other hand, if the bond was issued pursuant to a plan of reorganization, its issue

---

[3]With respect to corporate bonds issued after May 27, 1969, sec. 1.163–4(a)(1), Income Tax Regs., provides:

"If an obligation is issued by a corporation with original issue discount, the amount of such discount is deductible as interest and shall be prorated or amortized over the life of the obligation. * * * in general, the amount of original issue discount equals the excess of the amount payable at maturity over the issue price of the bond (as defined in paragraph (b)(2) of section 1.1232–3) * * *"

price was deemed to be the stated redemption price, meaning, of course, that there could be no original issue discount.[4]

By its terms, section 1232 applies only to the income to be recognized by the bondholder. The Income Tax Regulations provide, however, that the definition of "original issue discount" found in section 1232(b)(1) also applies with respect to the interest expense deductions of the issuer. Sec. 1.163–4(a)(1), Income Tax Regs.[5] Accordingly, the question whether there was original issue discount on the issuance of the debentures in the 1974 exchange turns on whether the debentures were, within the meaning of old section 1232(b)(2), "issued pursuant to a plan of reorganization within the meaning of section 368(a)(1)."

Respondent contends that the debentures were issued as part of a reorganization in the form of a recapitalization under section 368(a)(1)(E), and, accordingly, that the debentures' issue price was equal to their redemption price.[6] Petitioner argues that there was no section 368(a)(1)(E) reorganization, and that the debentures' issue price was equal to the fair market value of the stock for which they were exchanged. We hold for respondent.

The term "recapitalization" as used in section 368(a)(1)(E) is not itself defined in the Code, and the regulations do not attempt a definition except by way of illustration. Sec. 1.368–2(e), Income Tax Regs. The Supreme Court has, however, explained that the term denotes a "reshuffling of a capital structure, within the framework of an existing corporation." *Helvering v. Southwest Consol. Corp.*, 315 U.S. 194, 202 (1942).

In a number of decided cases, exchanges by corporations of newly issued debentures for outstanding stock have been held

---

[4]The exception to the general rule of sec. 1232(b)(2) for "bond[s] * * * issued pursuant to a plan of reorganization" was removed by the Technical Corrections Act of 1982, Pub. L. 97–448, sec. 306(a)(9)(C)(i), effective for bonds issued after Dec. 13, 1982. This amendment has no effect on the present case. As Representative Rostenkowski stated: "No inference is intended by this amendment as to the state of present law." 128 Cong. Rec. H9603 (Dec. 13, 1982).

[5]See note 3 *supra*. The validity of this regulation has been upheld by this Court. *Seaboard Coffee Service, Inc. v. Commissioner*, 71 T.C. 465, 469 (1978).

[6]Respondent cites sec. 1.1232–3(b)(2)(iii)(d), Income Tax Regs., which provides:

"An exchange which is not pursuant to a reorganization * * * is an exchange in which the obligation or investment unit is not issued pursuant to a plan of reorganization within the meaning of section 368(a)(1) or pursuant to an insolvency reorganization within the meaning of section 371, 373, or 374. Thus, for example, no original issue discount is created on an obligation issued in a recapitalization within the meaning of section 368(a)(1)(E). * * *"

to qualify as reorganizations described in section 368(a)(1)(E) (hereinafter E reorganizations). *Microdot, Inc. v. United States*, 728 F.2d 593 (2d Cir. 1984) (new debentures for outstanding common stock); *Berner v. United States*, 151 Ct. Cl. 128, 282 F.2d 720 (1960) (new debentures for preferred stock); *Davis v. Penfield*, 205 F.2d 798 (5th Cir. 1953) (new debentures for preferred stock); *Hickok v. Commissioner*, 32 T.C. 80 (1959) (new debentures for common stock); *Seide v. Commissioner*, 18 T.C. 502 (1952) (new debentures for preferred stock); *Wolf Envelope Co. v. Commissioner*, 17 T.C. 471 (1951) (new debentures for "class A" common stock and new common for old "class B" common stock); *Schoo v. Commissioner*, 47 B.T.A. 459 (1942) (new common for old common stock and new debentures for preferred stock). These cases expressly or implicitly adopt the premise that "the long term funded debt of a corporation is usually regarded as forming part of its capital structure." *Commissioner v. Neustadt's Trust*, 131 F.2d 528, 530 (2d Cir. 1942), affg. 43 B.T.A. 848 (1941).[7]

It is clear that the 1974 exchange effected a recapitalization of petitioner. Just prior to the exchange offer, petitioner had 1,592,321 shares of common stock outstanding. It offered to exchange debentures for 400,000 shares, about 25 percent, of its stock, and had the option of accepting 800,000 shares, about 50 percent, of its stock in exchange for debentures. Even the ultimate acceptance of 181,718 shares of its stock constituted a significant shift of funds within the corporate structure, sufficient to qualify as a recapitalization. We hold, therefore,

---

[7]All of these cases, except *Microdot, Inc. v. United States*, 728 F.2d 593 (2d Cir. 1984), arose under the 1939 Code. As pointed out in the text, *infra*, sec. 368(a)(1)(E), which defines "reorganization" to include a "recapitalization," uses the same language as 1939 Code sec. 112(g)(1)(D), and was intended to have the same meaning. S. Rept. 1622, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess. 272–273 (1954); *Microdot, Inc. v. United States, supra* at 596.

A stock-for-bonds exchange was found not to constitute an E reorganization in *Bazley v. Commissioner*, 331 U.S. 737 (1947), in which the three shareholders of a family corporation turned in their old stock in exchange for new stock and bonds, each of which was received in proportion to the stock surrendered. The Supreme Court stated that:

"In the case of a corporation which has undistributed earnings, the creation of new corporate obligations which are transferred to stockholders in relation to their former holdings, so as to produce, for all practical purposes, the same result as a distribution of cash earnings of equivalent value, cannot obtain tax immunity because cast in the form of a recapitalization-reorganization. * * * [*Bazley v. Commissioner, supra* at 742.]"

The record indicates that the bonds in the present case were not distributed pro rata to all stockholders, as were the bonds in *Bazley*, nor has petitioner argued that the exchanges concerned in the two cases were similar.

that petitioner's 1974 exchange of its debentures for its common stock was an E reorganization and that, consequently, the 1974 exchange did not produce original issue discount.

Petitioner argues that the 1974 exchange was not an E reorganization, and thus not within the exception to the general rule of section 1232(b)(2), because there was no continuity of proprietary interest on the part of the stockholders who exchanged their shares for bonds.[8] To support its position, petitioner cites section 1.368–1(b), Income Tax Regs. That section provides, in general terms, that the purpose of the reorganization provisions is to exempt from taxation only those transactions which "effect only a readjustment of continuing interest in property under modified corporate forms"; in order to constitute a reorganization, a transaction must generally evince "a continuity of interest * * * [in the corporation] on the part of those persons who, directly or indirectly, were the owners of the enterprise prior to the reorganization." Petitioner argues that respondent's position "completely ignores" this regulation.

We do not think these general statements in the regulations apply to a reorganization in the form of a recapitalization. The continuity-of-interest doctrine apparently had its roots in *Cortland Specialty Co. v. Commissioner*, 60 F.2d 937, 940 (2d Cir. 1932), affg. 22 B.T.A. 808 (1931), where one corporation transferred substantially all its properties to another corporation for cash and notes and argued that a reorganization in the form of a "merger or consolidation" (see sec. 368(a)(1)(A)) had been effected; the court held that the transaction, though within the literal language of the statute, was not a reorganization but was more like a sale because there was no "continuity of interest on the part of the transferor corporation or its stockholders." That opinion was followed by Supreme Court decisions applying the doctrine and holding that

___

[8]The following statement of the continuity-of-interest doctrine is found in *Southwest Natural Gas Co. v. Commissioner*, 189 F.2d 332, 334 (5th Cir. 1951), affg. 14 T.C. 81 (1950), involving a merger or consolidation:

"While no precise formula has been expressed for determining whether there has been retention of the requisite interest, it seems clear that * * * [there must be] a showing: (1) that the transferor corporation or its shareholders retained a substantial proprietary stake in the enterprise represented by a material interest in the affairs of the transferee corporation, and, (2) that such retained interest represents a substantial part of the value of the property transferred. [Fn. ref. omitted.]"

the transactions in issue were not reorganizations but were more akin to sales. *LeTulle v. Scofield*, 308 U.S. 415 (1940) (transfer of assets from one corporation to another for cash and bonds); *Pinellas Ice Co. v. Commissioner*, 287 U.S. 462 (1933) (transfer of assets of one corporation to another for cash and short-term notes). In other cases, the Supreme Court has rejected the sale argument in the light of the particular facts and has held transfers of assets from one corporation to another to constitute reorganizations. *Helvering v. Minnesota Tea Co.*, 296 U.S. 378 (1935) (assets for common stock and cash); *Nelson Co. v. Helvering*, 296 U.S. 374 (1935) (assets for preferred stock and cash); *Helvering v. Watts*, 296 U.S. 387 (1935) (stock of one corporation for stock and bonds of another corporation). The continuity-of-interest doctrine thus has been used to distinguish a reorganization from a sale of corporate assets. B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 14.11 at 14–25 (4th ed. 1979). Indeed, section 1.368–2(a), Income Tax Regs., states:

The term [reorganization] does not embrace the mere purchase by one corporation of the properties of another corporation, for it imports a continuity of interest on the part of the transferor or its shareholders in the properties transferred. * * *

We think it reasonably clear, therefore, that the general statements quoted above from section 1.368–1(b), Income Tax Regs., were not intended to extend the continuity-of-interest doctrine to recapitalizations. Such a reorganization clearly does not involve a sale or other similar transfer of capital assets.

Respondent does not seriously argue that there was a continuity of interest on the part of the exchanging shareholders in the 1974 exchange, but he contends that the transaction was nonetheless an E reorganization because the continuity-of-interest requirement is inapplicable to such reorganizations. Respondent's position is supported by this Court's holding in *Hickok v. Commissioner*, 32 T.C. 80, 89–90 (1959), in which this Court stated:

It is quite apparent that the considerations which make such a doctrine necessary in the merger and consolidation cases are simply not present in a recapitalization. A recapitalization of a single corporation often contemplates some change in interest, such as from stockholder to bondholder, and

in a sense such a change might always be called an interruption of continuity. \* \* \* It cannot be that the term "recapitalization" in the statute includes a requirement of the continuance of the old interest in proprietary form when recapitalization plans so often contemplate converting such interest to a nonproprietary form. We think that the "continuity of interest" doctrine has no application to a recapitalization such as took place in the instant case. [Fn. ref. ommitted.][9]

Petitioner contends, however, that statutory changes between the time of the transaction presented in *Hickok* and the 1974 exchange have established continuity of interest as an element of an E reorganization. In *Hickok*, in an attempt to eliminate dissident minority shareholders, the corporation issued bonds in exchange for those shareholders' common stock. Under then applicable law, this Court's holding that the exchange was an E reorganization in spite of the lack of continuity of interest meant that the former shareholders recognized no gain on the receipt of the bonds. The controlling statute was section 112(b)(3) of the 1939 Code, the predecessor of the present section 354(a)(1), which is as follows:

(1) IN GENERAL.—No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.

During the years here before the Court, however, the following exception to the section 354(a)(1) rule of nonrecognition was provided in section 354(a)(2), which had no predecessor in the 1939 Code:

(2) LIMITATION.—Paragraph (1) shall not apply if—
    (A) the principal amount of any such securities received exceeds the principal amount of any such securities surrendered, or
    (B) any such securities are received and no such securities are surrendered.

Thus, the shareholders' gain on the exchange in *Hickok* would have been recognized under the law which controls this case

---

[9]The Court's opinion on this point in *Hickok v. Commissioner*, 32 T.C. 80 (1959), was based upon similar analyses in *Commissioner v. Edmonds' Estate*, 165 F.2d 715, 719 (3d Cir. 1948); *Penfield v. Davis*, 105 F. Supp. 292, 311 (N.D. Ala. 1952), affd. 205 F.2d 798 (5th Cir. 1953); *Schoo v. Commissioner*, 47 B.T.A. 459, 461 (1942). See also Rev. Rul. 77–415, 1977–2 C.B. 311, in which respondent abandoned the litigating position he had taken in *Hickok v. Commissioner, supra*, and adopted this Court's view that continuity of interest was not required in an E reorganization.

even if the exchange constituted an E reorganization because, as in the present case, securities were received and none were surrendered.

We do not agree with petitioner, however, that the 1974 exchange was not a reorganization simply because the recipients of the debentures may have recognized gain on the transaction. Although the addition of section 354(a)(2) to the Code in 1954 changed the *tax consequences* to the shareholders in corporations which are parties to reorganizations, nothing in the Code or in the legislative history suggests that the meaning of "recapitalization" as used in section 368(a)(1)(E) was to be affected by the change. Section 368(a)(1) of the 1954 Code uses the same language as 1939 Code section 112(g)(1), and its legislative history leaves no doubt that it was intended to make no change in the law. S. Rept. 1622, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d. Sess. 272–273 (1954). The same report, at page 265, discusses section 354 in the following terms:

section 354 provides rules for exchanges by shareholders and security holders in reorganizations described in sections 368(a)(1)(A), (B), (C), (E), and (F). * * * It will be noted that section 354 applies to a transaction in which one corporation acquires the stock of another under the terms of section 368(a)(1)(B). Except for this, subsections 354(a) and (b) apply only to recapitalizations and transactions in which all or substantially all of the assets of one corporation are transferred to a single transferee corporation.

Section 354(a) is derived from section 112(b)(3) of the Internal Revenue Code of 1939, but makes clear that securities may only be received tax free in an amount not in excess of the principal amount of securities surrendered. If securities in any greater amount are received the fair market value of the excess amount is treated as other property. Likewise, if securities' are received and no securities are surrendered such securities are treated as other property.

These passages confirm that, in enacting the 1954 Code, Congress did not intend to change the definition of an E reorganization, but merely contemplated that securities received by shareholders in such reorganizations in excess of the principal amount of those surrendered will be taxed as "boot" under section 356. The 1974 exchange was, therefore, an E reorganization even though there was no continuity of proprietary interest and even though the transaction resulted in taxable gain to the shareholders involved.

Our view in this regard is consistent with that of the Court of Appeals for the Second Circuit in the recently decided case of *Microdot, Inc. v. United States, supra*, which also involved an exchange of new bonds for outstanding common stock very similar to the 1974 exchange in the present case. The court held that the transaction was a recapitalization under section 368(a)(1)(E) in spite of the fact that the stockholders were taxed on any gain realized on receipt of the bonds. Referring to the cases cited above holding that exchanges of debentures for stock constituted recapitalizations, the court stated (728 F.2d at 597–598):

While section 354(a)(2)(B) would have required a different result if it had been in effect when the cases were decided under the 1939 Code, it would have done so only insofar as the taxability of the exchange to the shareholders was involved. Section 354(a)(2)(B) does not purport to define recapitalization; indeed, the term is not mentioned. As stated above, the 1954 Code reenacted the 1939 Code definition of reorganization without change and without definition of recapitalization. We conclude that section 354(a)(2)(B) does not bear on the issue before us. * * *

In short, contrary to Microdot's arguments, the definition of reorganization, with its inclusion of recapitalization, does not incorporate any reference to the tax consequences of a transaction to the shareholders. Section 368(a)(1) is a definitional section, wholly distinct from section 354.

[Fn. ref. omitted.]

Petitioner argues that the 1974 exchange was not a reorganization for the additional reason that it was not motivated by an appropriate business purpose. Like the continuity-of-interest requirement, the business purpose requirement is not prescribed by the Code, itself, but was developed through judicial decisions. Thus, in *Gregory v. Helvering*, 293 U.S. 465, 467 (1935), the Supreme Court refused to give effect to a transaction structured as a corporate reorganization but entered into for the sole purpose of transferring certain corporate assets to a shareholder in order for her to "sell them for her individual profit, and, at the same time, diminish the amount of income tax which would result from a direct transfer by way of dividend." Because the purported reorganization was "an operation having no business or corporate purpose—a mere device which put on the form of a corporate reorganization as a disguise for concealing its real character," the Court disregarded it. *Gregory v. Helvering, supra* at 469. The business purpose doctrine is also set forth generally in

section 1.368–1(b), Income Tax Regs., which states that the reorganization provisions apply to "readjustments of corporate structures * * * required by business exigencies."[10]

We agree with petitioner that a valid business purpose is a requirement of an E reorganization, but we do not find such a purpose lacking in the present case.

We note initially that the business purpose doctrine has historically been used by the courts as a rationale for disregarding transactions which have as their purpose "one which defeats or contradicts the apparent transaction." *Chisholm v. Commissioner*, 79 F.2d 14, 15 (2d Cir. 1935), revg. 29 B.T.A. 1334 (1934). The essence of the business purpose doctrine as applied in most contexts is that a transaction should not be given effect for tax purposes unless it serves a purpose other than tax avoidance. B. Bittker & J. Eustice, *supra*, par. 14.51, at 14–127 (4th ed. 1979). Petitioner has cited no case in which the doctrine has been successfully asserted by a *taxpayer* seeking to avoid the consequences of *its own* transaction—and certainly none in which the taxpayer, itself, declared at the time that the transaction had a business purpose—and we question whether the doctrine can be so employed. Even assuming that it can be, however, petitioner's argument must fail, because there was a business purpose for the 1974 exchange.

As set forth above, the offering circular stated management's belief that the 1974 exchange would benefit "the Company, its remaining stockholders and the Debenture holders." On brief, petitioner states that it decided to acquire some of its outstanding stock because it considered the stock to be "undervalued and a good buy at the time." In other words, petitioner concedes that it entered into the 1974 exchange because it believed that the transaction would increase the value of the remaining stock while giving those shareholders choosing to surrender their stock increased security and a fixed rate of return. The surrendered stock, however, was not canceled but was held as treasury stock subject to resale by

---

[10]See also sec. 1.368–1(c), Income Tax Regs., which provides that a—

"scheme, which involves an abrupt departure from normal reorganization procedure in connection with a transaction on which the imposition of tax is imminent, such as a mere device that puts on the form of a corporate reorganization as a disguise for concealing its real character, and the object and accomplishment of which is the consummation of a preconceived plan having no business or corporate purpose, is not a plan of reorganization."

petitioner. The 1974 exchange no doubt affected the future marketability of petitioner's stock and, significantly, petitioner's outstanding stock rose from approximately 1,590,000 shares in 1974 to 5 million shares in 1979. The transaction was not undertaken for reasons of tax avoidance, nor was there any attempt to conceal its true character. It was exactly what it purported to be, an exchange of debt for equity undertaken for sound economic reasons. Accordingly, there was a business purpose for the transaction.[11]

Petitioner next argues that, even if the 1974 exchange did constitute an E reorganization, it should still not be considered a reorganization for purposes of the section 1232(b)(2) exception. That exception, it argues, was intended to apply only to *tax-free* reorganizations, and not to transactions which are fully taxable to the shareholders or former shareholders under section 354(a)(2). Petitioner's argument is based on the legislative history of section 1232(b)(2).

The bill which became the Tax Reform Act of 1969, as approved by the House and by the Senate Finance Committee, would have amended section 1232(b)(2) to define the "issue price" of a bond issued for property as the fair market value of the property.[12] When the bill was before the entire Senate, John S. Nolan, Deputy Assistant Secretary, Department of Treasury, wrote a letter dated November 28, 1969, to Senator John J. Williams, a member of the Senate Finance Committee, in which he expressed his concern that the definition was overbroad and stated his belief that the general rule should not apply "where bonds are issued in a tax-free reorganization." Mr. Nolan's views were set forth as follows:

> The reorganization problem arises because in a tax-free reorganization, no gain or loss is recognized to the corporations involved and the basis of the assets of the transferor corporation carries over, that is, such assets have the same basis in the hands of the transferee corporation. Under these

---

[11]In view of petitioner's declaration that the 1974 exchange benefited both the corporation and its shareholders, we need not deal with the question whether only the benefits of the corporation may be considered. See *Parshelsky's Estate v. Commissioner*, 303 F.2d 14, 18 (2d Cir. 1962), revg. and remanding 34 T.C. 946 (1960).

[12]The bill provided as follows:

"In the case of a bond or other evidence of indebtedness * * * as described in this paragraph, issued for property, the issue price of such bond or other evidence of indebtedness * * * shall be the fair market value of such property. [H.R. 13270, 91st Cong., 1st Sess., sec. 413(b) (1969).]"

H. Rept. 91–413 (1969), 1969–3 C.B. 200, 269; S. Rept. 91–552 (1969), 1969–3 C.B. 423, 517.

circumstances, original issue discount should not be taken into account so as to give the transferee corporation an amortization deduction as a result of the issuance of its bonds in the reorganization. In other situations, the issuing corporation pays a price where there is original issue discount because the basis of the assets is their lower value at the time the bonds are issued rather than the face amount of the bonds. In a reorganization, however, where the basis of the assets carries over, this "leveling" factor does not exist and there is every reason for the issuing corporation to claim a low value for the assets to increase its amortization deduction for bond discount if such a deduction is allowed. Thus, the danger of the Government being whipsawed is even greater.

\*    \*    \*    \*    \*    \*    \*

We therefore recommend that a floor amendment be offered \* \* \* [under which] original issue discount will not be deemed to exist where a bond is issued in a "reorganization" as defined in section 368 or sections 371–374 of the Code. [115 Cong. Rec. 36,730—36,731 (Dec. 3, 1969).]

Senator Williams responded to Mr. Nolan's letter by offering an amendment which contained the exception for "bond[s] \* \* \* issued pursuant to a plan of reorganization," which was subsequently enacted.[13]

Petitioners argue that—

the Nolan letter and such legislative history as exists relating to the floor amendment show that the amendment was intended to preclude original issue discount where bonds are issued for property pursuant to a *tax-free* reorganization. No limitation, other than the requirement that either the debt or the stock be publicly traded, was intended for fully taxable transactions.

It is thus true that the reorganization exception in section 1232(b)(2) was enacted primarily to prevent a corporation a party to a reorganization from claiming original issue discount based on the low value of property received for its bonds, while at the same time claiming a high basis in that property under the carryover basis provisions of section 362(b). We realize that when the property received for the bonds is the corporation's own stock, as it was in the present case, the question of its basis is of relatively little moment. The stock is not depreciable under section 167 and the corporation will recognize neither gain nor loss on its subsequent disposition. Sec. 1032(a).

---

[13]The legislative history of this provision is reviewed in greater detail in *Seaboard Coffee Service, Inc. v. Commissioner,* 71 T.C. 465, 471–473 (1978).

We are, however, confronted with an unambiguous statute drafted in anticipation of the general problem at hand. Mr. Nolan's letter to Senator Williams indicated that the Treasury Department was concerned that the definition of "original issue discount" contained in the bill as it then stood was too broad. Petitioner has argued skillfully that the exception carved out of that definition for "bond[s] * * * issued pursuant to a plan of reorganization" was itself too broad a response to the problem perceived. But the exception was, nonetheless, the one which Congress enacted, and we are bound to give effect to the plain words of the statute.[14] Therefore, our holding that the 1974 exchange was a reorganization requires us also to conclude that it was within the exception to the general rule of section 1232(b)(2), even though the transaction was not tax free to the shareholders who surrendered their stock for bonds.

Reaching this same conclusion in *Microdot, Inc. v. United States, supra* at 598–599, the court, after emphasizing that section 368 was a definitional section, wholly distinct from section 354, said:

Having reached this conclusion, we wish to point out that in section 1232(b)(2), in which Congress excluded bonds issued in reorganizations as defined in section 368(a)(1) from original issue discount treatment, Congress did not expressly limit the exclusion to reorganizations that are tax free. Absent any "clear provision" of "legislative grace," which must be shown before a deduction may be allowed, we * * * hold that bonds issued in reorganizations pursuant to section 368(a)(1)—whether or not taxable to the shareholders—are not eligible for original issue discount treatment. [Fn. refs. omitted.]

Petitioner also argues that, prior to the issuance of Rev. Rul. 77–415, respondent's established position was that debt-for-equity exchanges such as the 1974 exchange failed to qualify as statutory reorganizations because continuity of interest was lacking. Petitioner argues that respondent changed his position by concluding in Rev. Rul. 77–415, 1977–2 C.B. 311, that such a transaction *did* constitute a statutory reorganization,

[14]As the Supreme Court has stated, the courts should look to the legislative history of the statute "to solve doubt and not to create it." *Wisconsin R.R. Comm. v. C., B. & Q. R.R. Co.*, 257 U.S. 563, 589 (1922). "Neither we nor the Commissioner may rewrite the statute simply because we may feel that the scheme it creates could be improved upon." *Untied States v. Calamaro*, 354 U.S. 351, 357 (1957). There is "no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes." *United States v. American Trucking Associations*, 310 U.S. 534, 543 (1940).

and that it was an abuse of respondent's discretion to apply the new position retroactively to the 1974 exchange.

We need not consider this argument because our holding that the 1974 exchange was an E reorganization is not based on the revenue ruling, but on our own reading of section 368(a)(1)(E) and the cases interpreting it. As shown in the foregoing discussion, respondent's previous litigation position on this issue had been declared erroneous by this Court and other courts long before petitioner entered into the 1974 exchange; it is difficult for us to see how it can be said that petitioner had acquired some kind of vested interest in respondent's error. We note, moreover, that the Commissioner has broad discretion under section 7805(b) to decide whether rulings shall be applied retroactively, and that his discretion is greatest when the question is a legal one, as it is in the present case, rather than a purely administrative matter. Cf. *Elkins v. Commissioner*, 81 T.C. 669, 681 n. 20 (1983). Indeed, respondent is empowered retroactively to correct mistaken interpretations of the law even where a taxpayer has relied to his detriment on the old interpretation. *Dixon v. United States*, 381 U.S. 68, 72–73 (1965).

Finally, petitioner argues that, because it relied on respondent's former position that a transaction like the 1974 exchange did not qualify as an E reorganization, respondent should be equitably estopped from applying to petitioners his new position stated in Rev. Rul. 77–415. This argument is very similar to petitioner's argument that the retroactive application of the ruling was an abuse of discretion under section 7805(b),[15] and it must likewise be rejected. As the Court stated in *Automobile Club v. Commissioner*, 353 U.S. 180, 183 (1957): "The doctrine of equitable estoppel is not a bar to the correction by the Commissioner of a mistake of law." See also *Keystone Automobile Club v. Commissioner*, 12 T.C. 1038, 1047 (1949), affd. 181 F.2d 402 (3d Cir. 1950); *Agricultural Securities Corp. v. Commissioner*, 39 B.T.A. 1103, 1114 (1939), affd. per

---

[15] As two commentators have noted:

"The distinction between quasi-estoppel and abuse of discretion is more of terminology than of substance since both labels are grounded upon quite similar foundations. [Lynn & Gerson, 'Quasi-Estoppel and Abuse of Discretion as Applied Against the United States in Federal Tax Controversies,' 19 Tax L. Rev. 487, 489 (1964).]"

curiam 116 F.2d 800 (9th Cir. 1941); *Reibert v. Commissioner*, 7 B.T.A. 1198, 1201 (1927).

To reflect the foregoing,

*Decisions will be entered for the respondent.*